NO-CV-30

1  MICHAEL L. ARMITAGE (CA Bar No. 152740)
2  armitage@waterskraus.com
   **WATERS, KRAUS, & PAUL**
3  222 North Pacific Coast Highway, Suite 1900
   El Segundo, California 90245
4  Tel: (310) 414-8146; Fax: (310) 414-8156
5
6  CHARLES S. SIEGEL (*pro hac* pending)
   csiegel@waterskraus.com
7  TARYN E. OURSO (*pro hac* pending)
   tourso@waterskraus.com
8  **WATERS & KRAUS, LLP**
9  3141 Hood Street, Suite 700
   Dallas, Texas 75219
10 Tel: (214) 357-6244; Fax: (214) 357-7252
11
12 BRIAN P. BARROW (CA Bar No. 177906)
   brian@bartlettbarrow.com
13 JENNIFER L. BARTLETT (CA Bar No. 183154)
   jennifer@bartlettbarrow.com
14 **BARTLETT BARROW LLP**
15 225 S. Lake Avenue, Suite 300
   Pasadena, California 91101
16 Tel: (626) 432-7234; Fax: n/a
17 *Attorneys for Relator*
18
19            **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
20
   UNITED STATES OF AMERICA and the
21 STATES OF CALIFORNIA,
   COLORADO, NEW MEXICO, and
22 VIRGINIA *ex rel.* KAREN LAPCEWICH,
                        Relator,
23                v.
24
   TOTAL COMMUNITY OPTIONS, INC.,
25 TOTAL LONGTERM CARE, INC.,
   INNOVAGE GREATER COLORADO
26 PACE-LOVELAND, LLC, INNOVAGE
   CALIFORNIA PACE-INLAND EMPIRE,
27 TOTAL COMMUNITY CARE, LLC, and
28

EDCV19 01370 -CAS- SPx

**FALSE CLAIMS ACT COMPLAINT**

*JURY TRIAL DEMANDED*

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO  31 U.S.C. § 3730(B)(2)**

**DO NOT PLACE ON PACER**
**DO NOT SERVE DEFENDANTS**
**DO NOT PLACE IN PRESS BOX**

FILED
CLERK, U.S. DISTRICT COURT

JUL 25 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

PAID

JUL 25 2019

Clerk, US District Court
COURT 4612

1  INNOVAGE VIRGINIA PACE-
   ROANOKE VALLEY, LLC,
2                         Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# FALSE CLAIMS ACT COMPLAINT

## I.   STATEMENT OF THE CASE

1.    *All-inclusive care*. On behalf of its aging beneficiaries, that is what the Government paid Defendants ("InnovAge") for. Instead, InnovAge pressed on with a plan to expand nationally, billing the Government per-capita for each beneficiary it collected along the way – all the while, denying them access to *thousands* of medically necessary services. Knowing that it was not delivering what the Government was buying, InnovAge actively hid the depth of its noncompliance from the Government.

2.    InnovAge executed agreements with the Government under the Program of All-Inclusive Care for the Elderly ("PACE"), promising to provide PACE participants with *all* medically necessary care so that they can live in their communities for as long as possible instead of living in a nursing home.

3.    Once a Government beneficiary opts into one of InnovAge's PACE programs, he or she *has* to receive *all* non-emergent medically necessary care through InnovAge. All-inclusive care – and nothing less – is the deal.

4.    And so, when InnovAge routinely refused to set up appointments for them, failed to deliver their medications on time, or denied them an opportunity to question why they were not receiving requested services, these PACE participants could not simply "go to another doctor." They relied on InnovAge's provider network.

5.    But its provider network was woefully inadequate to provide participants with all-inclusive care. Their doctors ordered thousands of services that InnovAge never scheduled – undeterred, InnovAge billed the Government as though it had.

6.    Participants waited for their medications to arrive, only to discover that InnovAge had never sent their prescriptions to a pharmacy. At other times, their medications arrived days or weeks late, and they were forced to suffer without them.

7.    When participants got fed up, they tried to advocate for themselves, but InnovAge did not listen. To the contrary, InnovAge refused to track many of their grievances, apparently not caring enough to do so, even though federal regulations

1

1    require PACE organizations to track all grievances and allow participants to appeal.

2         8.    Inevitably, some PACE-eligible seniors require more care than others.

3    Concerned about the effect on its bottom line, InnovAge discouraged needier seniors

4    from enrolling, even if they qualified for PACE. It also encouraged enrolled

5    participants to disenroll when they were too needy and required too much care.

6         9.    Perhaps InnovAge cherry-picked enrollees because it was motivated by

7    profit. Or maybe it did so because it knew that it *could not* deliver the all-inclusive

8    care that the Government was buying. Either way, it cheated the Government.

9         10.   Before 2015, all PACE organizations were non-profit businesses. In

10   2016, InnovAge became the first PACE organization to convert to a for-profit.

11   Community members voiced concerns that the conversion would result in subpar care

12   for PACE participants and undercut PACE's vital mission – *all-inclusive care*.

13        11.   Unfortunately, their concerns about a for-profit InnovAge were on point.

14        12.   In 2017, InnovAge recruited Ms. Lapcewich for an executive position

15   reporting directly to the CEO. Soon after arriving, she began to discover systemic,

16   companywide compliance problems. She requested audits, reports, facts, and figures,

17   and noted the lack of handbooks, structure, routine reports, and staff training.

18        13.   As she fought to figure out how deep InnovAge's noncompliance ran,

19   the CEO rebuked her and had her investigated. Ms. Lapcewich was disturbed to find

20   that InnovAge was laser-focused on growth even though it could not meet PACE

21   requirements for the participants it was already responsible for taking care of.

22        14.   In an August 2017 audit, CMS discovered some of InnovAge's

23   noncompliant practices and ordered InnovAge to take immediate corrective action.

24   Ms. Lapcewich was ready to dutifully march forward – but the CEO had other plans.

25        15.   Instead, InnovAge's CEO told her to withhold information from CMS so

26   InnovAge could "successfully" complete its corrective action plan. InnovAge's issues

27   ran much deeper than CMS knew – and InnovAge was determined to keep it that way.

28        16.   Before, during, and after the 2017 CMS audit, InnovAge committed

2

1   numerous, sanctionable violations warranting termination of its PACE agreements for
2   cause: it failed to correct significant deficiencies; it failed to substantially comply with
3   Government PACE regulations; it could not and did not ensure participants' health
4   and safety; and it failed to timely execute its mandatory corrective action plan.

5          17.    Ms. Lapcewich now appears in this Court on behalf of the United States
6   of America and of the States of California, Colorado, New Mexico, and Virginia to
7   demand accountability from Defendants, who have preyed on Government PACE
8   programs at the expense of quality patient care for elderly PACE participants.

9   **II.    JURISDICTION & VENUE**

10         18.    Relator brings civil Counts One through Three on behalf of the United
11  States against InnovAge under the federal False Claims Act, 31 U.S.C. §§ 3729 *et*
12  *seq.* (effective May 20, 2009). This Court has jurisdiction over these claims under 28
13  U.S.C. §§ 1331 and 1345, 31 U.S.C. § 3732(a), and 31 U.S.C. § 3730(b).

14         19.    Relator brings civil Counts Four through Fourteen on behalf of the States
15  of California, Colorado, New Mexico, and Virginia against InnovAge under their
16  respective false claims statutes. Jurisdiction is proper under 28 U.S.C. § 1367 because
17  these claims are part of the same case or controversy as those in Counts One to Three.

18         20.    At all relevant times, InnovAge regularly conducted substantial business
19  in the Central District of California. It is therefore subject to this Court's jurisdiction.

20         21.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because
21  InnovAge transacts business within it. Venue is also proper because several of the
22  fraudulent acts alleged herein and proscribed by 31 U.S.C. § 3729 occurred within it.

23  **III.   PARTIES**

24         **A.    Relator**

25         22.    Relator Karen Lapcewich is a United States citizen residing in Anaheim
26  Hills, California. She bases this suit on her personal knowledge of InnovAge's scheme
27  to defraud the United States of America and the States of California, Colorado, New
28  Mexico, and Virginia (together, the "Government"), which she discovered while

3

1  working as a Chief Operating Officer ("COO") at InnovAge in San Bernardino.

2       23.    Over several months in 2016 and 2017, InnovAge actively recruited Ms.

3  Lapcewich, who has a strong compliance background. Ultimately, she accepted the

4  COO position for InnovAge's Western region in June 2017.

5       24.    Soon after she started at InnovAge, Ms. Lapcewich discovered its

6  systemic noncompliance with Medicare and Medicaid regulations. Concerned about

7  how InnovAge's noncompliance was affecting its frail, elderly participants, she

8  diligently reported her findings to leadership and to her superior – InnovAge's CEO.

9  They rebuked her efforts. Faced with a choice to either accept an accusation of "job

10  abandonment" or to resign, she resigned in October 2017.

11       25.    Ms. Lapcewich is an original source of the information upon which she

12  bases her suit, as defined in 31 U.S.C. § 3730(e)(4) and the relevant state false claims

13  acts. She voluntarily disclosed her allegations to the United States and to the States of

14  California, Colorado, New Mexico, and Virginia in a pre-filing disclosure statement.

15  **B.    Defendants**

16       26.    Defendants operate for profit under common control. *See* Exhibit 1.[1]

17  Collectively, Ms. Lapcewich refers to them as "InnovAge."

18       27.    Defendant Total Community Options, Inc. ("InnovAge") is a corporation

19  formed in the State of Colorado. Its principal office is located at 8950 E. Lowry

20  Boulevard in Denver, Colorado; its California corporate address is 410 E. Parkcenter

21  Circle N, San Bernardino, California. It exercises common control of the other

22  Defendants as well as several additional PACE entities established after Ms.

23  Lapcewich's tenure at InnovAge ended in October 2017. It does business under the

24

25  _____

26       [1] INNOVAGE, *Designation of Innovage Affiliated Covered Entity*, (effective Sept. 23, 2013), https://www.myinnovage.com/media/MyInnovage/Required-
27  Disclaimers/Designation-of-Affiliated-Covered-Entity_10102018.docx (last visited Apr. 5, 2019).
28

**FALSE CLAIMS ACT COMPLAINT**
**FILED UNDER SEAL**

1   assumed names InnovAge, innovAge, Innovage, and innovage.

2       28.    Defendant Total Longterm Care, Inc. ("InnovAge Colorado") is a
3   corporation formed in the state of Colorado. Its principal office is located at 8950 E.
4   Lowry Boulevard in Denver, Colorado. In total, it does business under fifty (50)
5   assumed names and operates Colorado PACE centers in Aurora, Denver, Lakewood,
6   Pueblo, Thornton, and Loveland. It also operates six home care facilities and two
7   senior housing facilities in Colorado. According to InnovAge's website, its Colorado
8   locations serve approximately 2900 PACE participants.

9       29.    Defendant InnovAge Greater Colorado PACE-Loveland, LLC
10  ("InnovAge Loveland") is a limited liability company formed in the State of
11  Colorado. Its address is 8950 E. Lowry Boulevard, Denver, Colorado 80230. It
12  operates InnovAge's Loveland, Colorado PACE center.

13      30.    Defendant InnovAge California PACE-Inland Empire, LLC ("InnovAge
14  San Bernardino") is a limited liability company formed in Delaware. Its address is
15  8950 E. Lowry Boulevard, Denver, Colorado 80230. It operates a PACE center
16  serving over 400 PACE participants in San Bernardino, California, at 410 East
17  Parkcenter Circle North, San Bernardino, California.

18      31.    Defendant Total Community Care, LLC ("InnovAge Albuquerque") is a
19  limited liability company formed in the State of Colorado. Its address is 8950 E.
20  Lowry Boulevard, Denver, Colorado 80230. It is registered to do business in New
21  Mexico and operates an Albuquerque PACE center that serves around 400 seniors.

22      32.    Defendant InnovAge Virginia PACE-Roanoke Valley, LLC ("InnovAge
23  Roanoke") is a limited liability company formed in the State of Virginia. Its address
24  is 5251 Concourse Drive, Roanoke, Virginia 24019, and it operates a PACE center in
25  Roanoke, Virginia, that serves approximately 110 PACE participants.

26                    *InnovAge's Continued Expansion*

27      33.    After Ms. Lapcewich left InnovAge in October 2017, the company
28  continued to create additional entities and to acquire or open new PACE centers:

34.     In March 2018, InnovAge formed a Delaware entity named InnovAge California PACE-Los Angeles, LLC.

35.     In October 2018, InnovAge acquired three Virginia PACE centers in Charlottesville, Newport News, and Richmond, that serve around 550 participants.

36.     In August 2018, InnovAge acquired four PACE centers in Philadelphia, which serve approximately 600 PACE participants. These four centers are referred to as the Allegheny, Germantown, Roosevelt, and St. Bart's centers.

37.     According to its website, InnovAge plans to open a PACE center in Sacramento, California (associated with a Delaware entity named InnovAge California PACE-Sacramento, LLC).

## IV.     APPLICABLE LAW

### A.     Program of All-Inclusive Care for the Elderly ("PACE")

*Medicare*

38.     In 1965, Congress enacted Title XVIII of the Social Security Act to provide health insurance (Medicare) to individuals aged 65 or older and to persons with disabilities. *See* 42 U.S.C. §§ 1395, *et seq.*

39.     Medicare is split into Parts A, B, C, and D. A Medicare beneficiary may be covered under one or more parts and may have to pay a premium or a deductible.

40.     Medicare Part A is hospital coverage, which covers services such as hospital stays, home health care, or skilled nursing facility care.

41.     Medicare Part B is medical coverage, which covers medically necessary outpatient services such as doctor visits, outpatient services, and diagnostic screening.

42.     Medicare Part C, called Medicare Advantage, offers Medicare coverage through private health insurance companies.

43.     Medicare Part D is prescription drug coverage offered through private health plans, designed to lower prescription drug costs for Medicare beneficiaries.

*Medicaid*

44.     Congress enacted Title XIX of the Social Security Act in 1965 to help

6

1   individuals with limited income and resources pay for medical assistance (Medicaid).

2   *See id.* §§ 1396, *et seq.* Medicaid is state-administered and partly federally-funded.

3        45.    Some Medicaid patients must pay a "share of cost" such as a copayment,

4   deductible, or coinsurance. Each state establishes its share of cost requirements.

5                                      *PACE*

6        46.    PACE is a joint Medicare/Medicaid program that provides all-inclusive,

7   medically necessary health care services to qualifying seniors. Section 4801 of the

8   Balanced Budget Act of 1997 ("BBA") authorizes PACE coverage under Medicare.

9   *See* Social Security Act, Title XVIII, § 1894. Section 4802 of the BBA authorizes

10  PACE as a state option under Medicaid. *See id.* at Title XIX, § 1934.

11       47.    42 C.F.R. Part 460 (current through Apr. 5, 2019) governs PACE.

12       48.    A state is allowed (but not required) to elect PACE as a Medicaid benefit.

13  If a state elects PACE as a benefit, CMS must approve its PACE program plan.

14  However, if a state does not elect PACE as a benefit, no PACE organization may

15  operate a PACE program in that state. 42 U.S.C. § 460.30.

16       49.    A PACE program is a three-way partnership among the federal

17  government, a state government, and a PACE organization. Therefore, to receive

18  Government reimbursement for providing PACE services, a PACE organization

19  "must have an agreement with CMS and the State administering agency." *Id.*

20       50.    PACE provides "pre-paid, capitated, and comprehensive health care

21  services" to enhance frail elderly citizens' quality of life and autonomy. It enables a

22  PACE participant to live in his or her community for as long as feasible. CMS PACE

23  Manual, Ch. 1, § 30[2] and 42 C.F.R. § 460.4(b).

24       51.    PACE services include: primary care; hospital care; medical specialty

25  _____

26       [2] CMS, Programs of All-Inclusive Care for the Elderly (PACE) Manual
    (implemented June 3, 2011), https://www.cms.gov/Regulations-and-
27  Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019036.html [hereinafter
    "CMS PACE Manual"].
28

**FALSE CLAIMS ACT COMPLAINT**
**FILED UNDER SEAL**

1  services; prescription drugs; nursing home care; nursing and personal care services;
2  emergency services; home care; physical and occupational therapy; adult day health
3  care; recreational therapy; meals; dental care; nutritional counseling; social services;
4  lab services; end-of-life care; and transportation. CMS PACE Manual, Ch. 1, § 30.3.

5       52.    To be eligible for PACE, an individual must:

6        i.    Be 55 years of age or older;

7        ii.    Be determined by the State administering agency to need the level of
8             care required under the State Medicaid plan for coverage of nursing
9             facility services[.]

10        iii.    Reside in the PACE organization's service area.

11        iv.    Meet any additional program-specific eligibility conditions imposed
12             under the PACE program agreement.

13  42 C.F.R. § 460.150. As determined by criteria outlined in the applicable PACE
14  program agreement, the individual must also be able to live in the community
15  "without jeopardizing his or her health or safety." *Id.*

16       53.    As PACE operates under a unique regulatory scheme, PACE participants
17  who are Medicare or Medicaid beneficiaries are not responsible for copayments,
18  deductibles, or coinsurance usually required by Medicare or Medicaid. *Id.* §
19  460.90(a). However, they may be required to pay premiums or "spend down" income.

20       54.    A PACE participant need not be a Medicare or Medicaid beneficiary. 42
21  C.F.R. § 460.150(d). While most PACE participants are entitled to Medicare Part A,
22  are enrolled in Medicare Part B, or are Medicaid-eligible, other PACE participants
23  receive PACE services solely through private insurance or self-pay. *See id.*

24         *A PACE Organization Must Commit to Providing All-Inclusive Care*

25       55.    A PACE participant receives <u>all</u> medically necessary health care services
26  through PACE. 42 U.S.C. § 1396u-4(b)(1). PACE covers all care authorized by a
27  participant's interdisciplinary team, even if those services are not otherwise covered
28  by Medicare and Medicaid. *See* CMS PACE Manual, Ch. 1, § 30.3. Crucially, there

8

1  is *no limit* as to the duration, amount, or scope of medically necessary services to be
2  provided to PACE participants. *Id.*

3       56.    A PACE organization may provide some services under contract. *Id.*

4       57.    Because a PACE organization *must* provide all medically necessary care,
5  its participants "must receive Medicare and Medicaid benefits solely through the
6  PACE organization." 42 C.F.R. § 460.90(b). As such, PACE participants cannot
7  receive non-emergency care from non-PACE providers. Therefore, it is essential that
8  a PACE organization provide, and be able to provide, all medically necessary care.

9       58.    A PACE organization may operate for profit. *See* Social Security Act,
10 Title XVIII, § 1894(a)(3)(B) and Title XIX, § 1934(a)(3)(B). A for-profit PACE
11 organization must: have a governing body with participant representation; be able to
12 *fully provide* PACE services regardless of how much care participants need; safeguard
13 against conflicts of interest; be fiscally sound; and address grievances and appeals.

14                  *How a PACE Organization Receives Government Funds*

15      59.    A PACE organization assumes full financial risk for participant care
16 "without limit on amount, duration, or scope of services." CMS PACE Manual, Ch.
17 1, § 30.4.

18      60.    PACE is principally financed by monthly Medicare and Medicaid
19 prospective capitation payments, at rates specified in a PACE organization's program
20 agreement. 42 C.F.R. § 460.180. Payments "take into account the comparative frailty
21 of PACE enrollees relative to the general Medicare population." 42 C.F.R. §
22 460.180(b)(3). For each participant, the monthly capitation payment "is a fixed
23 amount, regardless of changes in the participant's health status." *Id.* § 460.180(b)(6).

24      61.    Because the Medicare monthly capitation amount is all-inclusive, a
25 PACE organization may only additionally collect: a participant's applicable premium;
26 permitted charges if Medicare is not the primary payer; a Medicaid capitation
27 payment; or a participant's spend-down liability payment. 42 C.F.R. § 460.180(b)(7).

28      62.    Likewise, the Medicaid monthly capitation amount is a fixed amount that

9

1   a PACE organization must accept "as payment in full for Medicaid participants and

2   may not bill, charge, collect, or receive any other form of payment from the [state or

3   the participant]," except for income spend-down liability payments or payments

4   received from Medicare and other payers. *Id.* § 460.182(b) and (c). No premium may

5   be collected from a Medicaid beneficiary, whether or not he or she has Medicare.

6       63.   Each month, a PACE organization combines enrollees' monthly

7   capitation payments into a common pool. *See* CMS PACE Manual, Ch. 1, § 30.4.

8   Payments made by private payers or individuals in certain circumstances are also

9   included. *Id.* From the pool, a PACE organization pays for its participants' health care

10  expenses, which are to include *all* medically necessary services. *Id.*

11      64.   In sum, while a PACE organization must provide all covered items or

12  services without collecting a deductible, copayment, or coinsurance, it *may* collect

13  applicable premiums or spend-down liability payments from a participant "who has

14  more income than allowed for Medicaid eligibility[.] . . . However, this spend-down

15  process is used to establish Medicaid eligibility rather than being the type of cost-

16  sharing [otherwise prohibited under PACE.]" CMS PACE Manual, Ch. 13, § 30.7;

17  *see also* 42 C.F.R. § 160.184 and 71 Fed. Reg. 71322 (Dec. 8, 2006).

18              *What a PACE Participant Pays to a PACE Organization*

19      65.   For a dual-eligible participant, a PACE organization receives two

20  monthly capitation payments – one from Medicare and one from Medicaid. 42 C.F.R.

21  § 460.186. It may not collect a premium but may collect spend-down liability.

22      66.   A participant eligible for Medicare but not for Medicaid must pay a

23  monthly premium equal to the Medicaid capitation amount, plus a premium for

24  Medicare Part D drugs. 42 C.F.R. § 460.186.

25      67.   A participant eligible for Medicaid but not for Medicare pays nothing

26  except any applicable spend-down liability. For Medicaid-only participants, the state

27  pays the PACE organization in full – premiums are expressly disallowed. *Id.*

28      68.   The chart below summarizes what a PACE participant must pay, which

10

depends upon whether he or she is a Medicare and/or Medicaid beneficiary:

| PACE Participant's Insurance Coverage | Monthly Amount PACE Participant Must Pay to PACE Organization |
|---|---|
| Dual-Eligible – Medicare & Medicaid | NO PREMIUM ALLOWED<br><br>(Participant only liable for any applicable spend-down liability) |
| Medicaid Only | NO PREMIUM ALLOWED<br><br>(Participant only liable for any applicable spend-down liability) |
| Medicare Parts A & B Only | Amount equal to Medicaid capitation amount plus Medicare Part D capitation amount |
| Medicare Part A Only | Amount equal to Medicaid capitation amount plus Medicare Parts B & D capitation amounts |
| Medicare Part B Only | Amount equal to Medicaid capitation amount plus Medicare Parts A & D capitation amounts |
| Private Pay/Insurance Only | Regulations do not specify an acceptable premium; however, CMS iterates that a PACE Organization may charge the combined Medicare & Medicaid capitation rates. |

11

1

*Share of Cost Spend-Down Liability for California Medi-Cal Beneficiaries*

2       69.    California regulations require Medi-Cal PACE participants to meet

3 income requirements to qualify for PACE coverage. *See* CAL. WELF. & INST. CODE

4 §§ 14593(c), 14002, 14005.12, and 14006. Each month, a PACE participant with a

5 Medi-Cal share of cost (spend-down liability) must pay or obligate that share of cost

6 to the PACE organization before Medi-Cal will pay for PACE services.[3]

7       70.    According to the California Department of Health Services boilerplate

8 PACE contract, Medi-Cal capitation payments for share of cost members are paid to

9 a PACE organization "at the end of each month,"[4] following the PACE organization's

10 certification that "the member's share of cost has been collected and cleared."[5]

11       71.    Each month, a California PACE organization must verify each Medi-Cal

12 participant's eligibility.[6] If a participant has Medi-Cal spend-down liability, the PACE

13 organization must clear that liability on its Medi-Cal reimbursement claim, adjusting

14 the claimed capitation amount to reflect the participant's contribution to the cost.[7]

15       72.    A PACE organization's claim submittals must reflect that the

16

17      [3] *See* DHCS, PACE MEMBER ENROLLMENT AGREEMENT TEMPLATE (Feb. 2012),

18 https://www.dhcs.ca.gov/services/ltc/Documents/PACE%20Member%20Enrollment%20A
greement.FINAL.032012.docx.

19

20      [4] *See* DHCS, PACE CONTRACT BOILERPLATE, Exhibit B at "Capitation Rates,"
https://www.dhcs.ca.gov/services/ltc/Documents/PACE%20Boilerplate%20Contract.Upda

21 ted%2012.2012.doc.

22      [5] *Id.*

23      [6] *See* MEDI-CAL GENERAL PROVIDER MANUAL, PART 1 MED-CAL PROGRAM AND
ELIGIBILITY, *Share of Cost (SOC)*, at 3 (updated Jan. 2019), https://files.medi-

24 cal.ca.gov/pubsdoco/publications/masters-mtp/part1/share_z01.doc.

25      [7] *See* MEDI-CAL LONG TERM CARE PROVIDER MANUAL, *Share of Cost (SOC): 25-1
for Long Term Care*, at 3-4 (updated Jan. 2019), https://files.medi-

26 cal.ca.gov/pubsdoco/publications/masters-mtp/part2/shareltc_l00.doc ("To determine how
much to bill Medi-Cal, subtract from a facility's monthly Medi-Cal rate the amount billed

27 to the recipient and bill Medi-Cal for the remainder.").

28 (footnote continued)

FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

1 | reimbursable Medi-Cal capitation amount has been reduced by the participant's Medi-

2 | Cal spend-down liability amount.[8]

3 | **B.     PACE Regulatory Scheme: 42 C.F.R. Part 460.**

4 | 73.    To operate a PACE program, a PACE organization must execute a

5 | program agreement with the state administering agency. 42 C.F.R. § 460.30.

6 | According to 42 C.F.R. § 460.32(a), its agreement must include, among other things:

7 | • A commitment to abide by Federal, State, and local laws and regulations

8 | • A description of the participant grievance and appeals process

9 | • A statement of policies on eligibility, enrollment, and disenrollment

10 | • A description of the services available to participants

11 | • A statement of the data that CMS and the state require it to collect

12 | 74.    CMS may impose sanctions if a PACE organization commits any of the

13 | following violations:

14 | • Fails substantially to provide medically necessary services

15 | • Discriminates in enrollment or disenrollment because of health status[9]

16 | • Engages in practices that effectively deny or discourage enrollment of

17 | Government beneficiaries who may need substantial medical services

18 | • Misrepresents or falsifies information furnished to CMS, a state, an

19 | individual, or any other entity under 42 C.F.R. Part 460

20 | 42 C.F.R. § 460.40 ("Violations for which CMS may impose sanctions.").

21 | 75.    Additionally, if a PACE organization does not substantially comply with

22 | Part 460, CMS or the state administering agency may terminate its PACE agreement,

23 | withhold payments until it corrects deficiencies, or condition the PACE agreement's

24 | continuation "upon the timely execution of a corrective action plan." *Id.* § 460.48.

25 |

26 | 

27 | [8] *Id.* at 3-4.

28 | [9] This practice is also known as "cherry-picking."

13

**FALSE CLAIMS ACT COMPLAINT**
**FILED UNDER SEAL**

1    76.    Either CMS or the state administering agency "may terminate at any time
a PACE program agreement for cause[.]" 42 C.F.R. § 460.50(a). "For cause" includes
a failure to correct "significant deficiencies in the quality of care furnished to
participants" or to "comply substantially with conditions for a PACE program [under
42 C.F.R. Part 460]." *Id.* § 460.50(b). "For cause" also includes a PACE
organization's inability to ensure its participant's health and safety. *Id.* § 460.50(a)(c).

77.    A PACE organization must operate under the control of a governing
body with responsibility for, among other things, "management and provision of all
services, including the management of contractors." *Id.* § 460.62(a). It must establish
a participant advisory committee to advise the governing body "on matters of concern
to participants." *Id.* § 460.62(b).

## CONTRACTED SERVICES

78.    A PACE organization must ensure "adequate services to meet the needs
of its participants," even if it must increase staffing to do so. 42 C.F.R. § 460.98(d)(2).
It may also utilize outside contractors to ensure it can offer all-inclusive care.

79.    A PACE organization must have written contracts with outside
contractors that furnish administrative or care-related services (excluding emergency
services). These contracts must require those contractors to meet federal and state
requirements, including Medicare and Medicaid participation requirements and 42
C.F.R. Part 460 requirements. *Id.* § 460.70 ("Contracted services.").

80.    The burden to document contractor compliance falls squarely on the
PACE organization, which must ensure that contractors comply with standards of
competency and quality of care. CMS PACE Manual, Ch. 9.

## INDIVIDUALIZED ASSESSMENTS & CARE PLANNING

81.    Each PACE participant must be assigned an interdisciplinary team
responsible for assessments, care planning, and care coordination. *Id.* § 460.102.

82.    A PACE participant's interdisciplinary team must "promptly develop a
comprehensive plan of care for *each* participant" and re-evaluate the plan of care "on

14

1  at least a semi-annual basis." *Id.* § 460.106.

2  **PACE PARTICIPANT GRIEVANCE PROCESS**

3  83.  A PACE organization must have "a formal written process" to evaluate
4  and resolve participant grievances *Id.* § 460.120(a); *see* 42 C.F.R. §§ 460.120 –
5  460.122. It must also "maintain, aggregate, and analyze information on grievance
6  proceedings." 42 C.F.R. § 460.120(f). In other words, it may not ignore a grievance.

7  **ENROLLMENT & DISENROLLMENT**

8  84.  If a PACE organization denies enrollment to a prospective participant
9  because "his or her health or safety would be jeopardized by living in a community
10 setting," it must: (1) notify the potential participant, in writing, of the reason for
11 denial; (2) refer the potential participant to alternative services if appropriate; (3)
12 maintain supporting documentation of the reason for denial; and (4) notify CMS and
13 the state administering agency. *Id.* § 460.152(b).

14 85.  Regardless of why a participant disenrolls, a PACE organization must
15 document the reasons for disenrollment, make that documentation available to CMS
16 and the state, and use voluntary disenrollment information in its internal quality
17 assessment and performance improvement program ("QAPI"). *Id.* § 460.172.

18 86.  A PACE participant may only be disenrolled due to: death; voluntary
19 disenrollment; or involuntary disenrollment for cause. CMS PACE Manual, Ch. 4.

20 **CONTINUED MONITORING OF PACE PROGRAMS**

21 87.  CMS and the state administering agency conduct annual reviews of a
22 PACE organization during its initial three-year trial period; thereafter, they conduct
23 on-site reviews at least every two years. 42 C.F.R. §§ 460.190, 460.192.

24 88.  A PACE organization "must take action to correct deficiencies identified
25 during reviews." *Id.* § 460.194 ("Corrective action."). However, a "[f]ailure to correct
26 deficiencies may result in sanctions or termination[.]" *Id.*

27 89.  As to its records, a PACE organization must maintain them for at least
28 "six years from the last entry date." *Id.* § 460.200. It must submit required reports to

FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

1 | CMS and the state administering agency. *Id.*

2 | *California, Colorado, New Mexico, and Virginia Elected PACE as a Benefit*

3 | 90.    California elected PACE as an optional benefit under its Medi-Cal State

4 | Plan. *See* CAL. WELF. & INST. CODE §§ 14591(j), 14132.94. Its Department of Health

5 | Care Services is the state administering agency for its PACE plan. *Id.* § 14592(b).

6 | 91.    California Medi-Cal PACE participants are subject to share of cost spend

7 | down obligations. *Id.* § 14593(c), 14005.12. For such participants, Medi-Cal does not

8 | contribute to the cost of care until the participant's share of cost has been certified (it

9 | has been paid to, or obligated to be paid to, the PACE organization).  Medi-Cal pays

10 | the difference between the Medi-Cal capitation rate and the participant's share of cost.

11 | Thus, a PACE organization is not entitled to Government reimbursement for the

12 | participant's share of cost – it is only entitled to the difference between the

13 | participant's spend-down share of cost and the Medi-Cal capitation rate.

14 | 92.    Colorado elected PACE as an optional benefit under its Medicaid

15 | program. *See* COLO. REV. STAT. §§ 25.5-203(1)(j) & 25.5-5-412. Colorado's

16 | Department of Health Care Policy is the state administering agency for Colorado's

17 | PACE plan. *See* COLO. CODE REGS. § 1011-1:XXVI-3.

18 | 93.    New Mexico elected PACE as an optional benefit under its Medicaid

19 | program. *See* N.M. CODE R. § 8.315.2.   The New Mexico Human Services

20 | Department is the state administering agency for its PACE plan. *Id.* § 8.315.2.1.

21 | 94.    Finally, Virginia elected PACE as an optional Medicaid benefit. *See* 12

22 | VA. ADMIN. CODE § 30-50-335. Virginia's Department of Medical Assistance

23 | Services is the state administering agency for its PACE plan. *Id.* § 30-50-335(A).

24 | **C.    Federal and State False Claims Acts**

25 | 95.    Relator brings claims against Defendants under the federal False Claims

26 | Act and the false claims acts of California, Colorado, New Mexico, and Virginia.

27 | *Federal False Claims Act*

28 | 96.    The federal False Claims Act was enacted over a century ago to

16

1  encourage private citizens to bring a civil action on the Government's behalf to
2  combat fraudulent claims for payment from the Government. *See, e.g., Universal*
3  *Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

4         97.    The federal False Claims Act provides that any person who:

5            (A)    knowingly presents, or causes to be presented, a false or
6                    fraudulent claim for payment or approval; [or]

7            (B)    knowingly makes, uses, or causes to be made or used, a false
8                    record or statement material to a false or fraudulent claim;

9                                            ***

10        is liable to the United States Government for a civil penalty of not less
11        than $5,000, and not more than $10,000, as adjusted . . . plus 3 times
12        the amount of damages which the Government sustains because of the
13        act of that person.

14  31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B).

15         98.    In 2015, Congress passed the Bipartisan Budget Act of 2015, which
16  required the civil penalty range referenced in the False Claims Act to be re-indexed
17  annually for inflation. Accordingly, for violations occurring after September 29, 1999,
18  but before November 2, 2015, the civil penalty range increased to $5,500 - $11,000
19  per violation. 28 C.F.R. § 85.3(a)(9). For civil penalties assessed after January 28,
20  2018, for violations occurring after November 2, 2015, the range increased to $11,181
21  - $22,363 per violation. See 28 C.F.R. § 85.5.

22         99.    The federal False Claims Act also prohibits an employer from retaliating
23  against an employee who engages in protected activity, which includes "lawful acts .
24  . . in furtherance of an action under [the False Claims Act]" and "other efforts to stop
25  1 or more [False Claims Act] violations." 31 U.S.C. § 3730(h)(1).

26        100.    Relief for a relator prevailing under the retaliation provision includes
27  "reinstatement with the same seniority status that employee . . . would have had but
28  for the discrimination, 2 times the amount of back pay, interest on the back pay, and

17

1   compensation for any special damages sustained as a result of the discrimination,

2   including litigation costs and reasonable attorneys' fees." *Id.* § 3730(h)(2).

3   *California False Claims Act*

4       101.   The California False Claims Act provides that any person who:

5             (1)    [k]nowingly presents or causes to be presented a false or

6                    fraudulent claim for payment or approval[;] [or]

7             (2)    [k]nowingly makes, uses, or causes to be made or used a false

8                    record or statement material to a false or fraudulent claim[;]

9   is liable to the state for "three times the amount of damages" the state sustains because

10   of the person's act, plus a civil penalty ranging from $5,500 to $11,000 for each

11   violation, adjusted for inflation. CAL. GOV'T CODE § 12651(a) (effective Jan. 1, 2018)

12   (prior version effective Jan. 1, 2013, to Dec. 31, 2017, did not provide for adjusting

13   penalties for inflation but is identical in all other respects).

14       102.   The California False Claims Act prohibits the same retaliatory actions as

15   the federal False Claims Act, and it provides for the same remedies to a relator entitled

16   to relief under its retaliation provision. *Id.* § 12653 (effective Jan. 1, 2013).

17   *Colorado Medicaid False Claims Act*

18       103.   The Colorado Medicaid False Claims Act provides that a person who:

19             (a)    [k]nowingly presents, or causes to be presented, a false or

20                    fraudulent claim for payment or approval; [or]

21             (b)    [k]nowingly makes, uses, or causes to be made or used a false

22                    record or statement material to a false or fraudulent claim;

23   is liable to the state for a civil penalty between $5,500 and $11,000, adjusted for

24   inflation, plus "three times the amount of damages that the state sustains" because of

25   the person's act. COLO. REV. STAT. § 25.5-4-305(1) (effective Aug. 7, 2013).

26   *New Mexico Fraud Against Taxpayers Act*

27       104.   New Mexico's Fraud Against Taxpayers Act says that a person shall not:

28             (1)    knowingly present, or cause to be presented, to an employee,

1             officer or agent of the state . . . or to a contractor, . . . or other

2             recipient of state . . . funds a false or fraudulent claim for

3             payment or approval; [or]

4        (2)      knowingly make or use, or cause to be made or used, a false,

5             misleading or fraudulent record or statement to obtain or

6             support the approval of or the payment on a false or

7             fraudulent claim[.]

8 N.M. STAT. ANN. § 44-9-3 (effective July 1, 2007). A person who violates these

9 sections is liable for "three times the amount of damages sustained by the state" due

10 to the violation, plus per-violation civil penalties between $5,000 and $10,000. *Id.*

11 *New Mexico Medicaid False Claims Act*

12      105.    New Mexico's Medicaid False Claims Act provides that a person who:

13        A.      presents, or causes to be presented, to the state a claim for

14             payment under the [M]edicaid program knowing that such

15             claim is false or fraudulent; [or]

16        C.      makes, uses or causes to be made or used a record or statement

17             to obtain a false or fraudulent claim under the [M]edicaid

18             program paid for or approved by the state knowing such

19             record or statement is false;

20 is liable for "three times the amount of damages that the state sustains" because of the

21 person's act. N.M. STAT. ANN. § 27-14-4 (effective May 19, 2004). The Act does not

22 provide for civil penalties.

23 *Virginia Fraud Against Taxpayers Act*

24      106.    The Virginia Fraud Against Taxpayers Act provides that a person who:

25        1.      [k]nowingly presents, or causes to be presented, a false or

26             fraudulent claim for payment or approval; [or]

27        2.      [k]nowingly makes, uses, or causes to be made or used a false

28             record or statement material to a false or fraudulent claim;

19

1    is liable to the Commonwealth of Virginia for a per-violation civil penalty between
2    $10,957 and $21,916, adjusted for inflation, plus "three times the amount of damages
3    sustained by the Commonwealth." VA. CODE ANN. § 8.01-216.3(A) (effective July 1,
4    2018) (prior version effective July 1, 2011, to June 30, 2018, did not provide for
5    adjusting penalties for inflation but is identical in all other respects).

6    **V.    FACTUAL BACKGROUND & DEFENDANTS' SCHEME**

7         107.   InnovAge began as a non-profit. Today, it is a for-profit company with
8    sixteen PACE centers in five states, affecting over 5,000 PACE participants.

9         108.   In 2006, Maureen Hewitt was appointed InnovAge's President and CEO.

10        109.   InnovAge entered into PACE program agreements with the Government
11   requiring it to abide by PACE regulations to receive Government reimbursement.
12   Indeed, the bulk of its revenue comes from Government capitation payments.

13        110.   InnovAge agreed to provide *all* medically necessary services and to
14   assume full financial risk without placing limits on the amount or scope of care.

15        111.   As of 2014, InnovAge received nearly $180 million in Medicare and
16   Medicaid capitation payments. As it has expanded, this amount has increased.

17        **A.    InnovAge Becomes a For-Profit PACE Organization**

18        112.   In 2015, CMS began allowing PACE organizations to operate for profit.

19        113.   Shortly thereafter in 2016, InnovAge converted to a for-profit business
20   with the Colorado Attorney General's approval.

21        114.   At a public hearing prior to approval, several commenters expressed
22   concern that InnovAge's conversion to a for-profit would lead to subpar care.

23        115.   At the same public hearing, CEO Maureen Hewitt explained in a
24   presentation that InnovAge sought to become a "national leader."

25        116.   Indeed, InnovAge touts itself as "the largest PACE provider in the U.S.,"

26

27

28

FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

1   with over 5,000 PACE participants in five states. *See* Exhibit 2.[10]

2       117.   It actively seeks continued expansion and has considered acquiring or
3   opening additional PACE centers in California, Michigan, the District of Columbia,
4   New Jersey, North Carolina, South Carolina, and New York.

5       118.   But, as set forth below, InnovAge cannot provide its *existing* participants
6   with all medically necessary care – yet it aspires to bill the Government even more.

7       **B.   InnovAge Hires Ms. Lapcewich as a Chief Operating Officer**

8       119.   Ms. Lapcewich has a lengthy background in compliance as a C-level
9   executive. In 2016, InnovAge began recruiting her for the COO position for its
10  Western Region. The opportunity appealed to her because of her compliance
11  background and her interest in working with seniors (as she had done in the past).

12      120.   In June 2017, Ms. Lapcewich accepted the position. She worked in San
13  Bernardino, California; however, her job duties included overseeing operations for all
14  Western Region InnovAge PACE centers, and she interacted with managers and
15  executives from InnovAge locations throughout the country.

16      121.   Ms. Lapcewich reported directly to the CEO, Maureen Hewitt.

17      **C.   Ms. Lapcewich Discovers Systemic Regulatory Noncompliance**

18      122.   Shortly after beginning work at InnovAge, Ms. Lapcewich discovered
19  that InnovAge had insufficient company-wide operations and infrastructure to
20  provide PACE seniors with all medically necessary services it was bound to provide.

21      123.   Below are issues Ms. Lapcewich discovered:

22                 **INNOVAGE FAILS TO DELIVER THOUSANDS OF ORDERED SERVICES**

23      124.   During her first several weeks at InnovAge, Ms. Lapcewich learned from
24  Kalondrea Davis, Executive Director of InnovAge's San Bernardino PACE center,
25  that the company had failed to carry out *thousands* of physician orders for medically

26  _____

27  [10]   InnovAge,   Infographic:   *InnovAge   PACE   by   the   Numbers*,
28  https://www.myinnovage.com/pace-infographic (Jan. 31, 2019).

1   necessary services. Ms. Davis told her that InnovAge had known about this problem

2   for years but it had persisted.

3          125.   Ms. Lapcewich conducted an informal independent audit to investigate.

4          126.   During her informal audit, she discovered that participants who had been

5   denied medically necessary services were adversely affected. For example, they

6   suffered from additional injury, pain, or exacerbation of chronic conditions. They

7   needed care and were entitled to it – but InnovAge did not provide it.

8          127.   Later, in October 2017, Kim Hendren (an RN and compliance consultant

9   to all InnovAge PACE centers) shared with Ms. Lapcewich the results of an internal

10  May 2016 compliance audit that InnovAge had conducted at its San Bernardino

11  PACE center. *See* Exhibits 3 – 4 (emails and narrative review of audit).

12         128.   A year earlier, on October 1, 2016, Ms. Hendren had sent the same

13  internal audit results to Lori Rothwell, Chief Compliance Officer, adding:

14  "[c]onsidering the sensitivity of my report, I am sending it only to you." *Id.*

15         129.   In her email to Ms. Rothwell, Ms. Hendren included a narrative of the

16  audit. In it, she noted that scheduling of appointments was "an extremely large

17  concern," with "hundreds of appointments for outside specialists" still outstanding.

18         130.   Ms. Hendren gave two examples of how delays affected participants:

19         131.   One participant had been ordered an appointment in November 2015 to

20  evaluate heavy bleeding. Although InnovAge's orders-tracking notes suggested the

21  appointment took place on November 30, 2015, no evidence of that appointment

22  exists in the participant's medical records. However, the participant's medical record

23  *does* contain documentation of a December 26, 2015 emergency room visit. Had

24  InnovAge timely cared for this participant, an ER visit may have been avoided.

25         132.   Another participant was labeled a "drug seeker" at an InnovAge meeting.

26  He suffered from osteoarthritis and boney overgrowth in his ankle, which was

27  reported as "huge." His doctor had ordered an orthopedic consult, but InnovAge had

28  not yet scheduled one. Meanwhile, he sought medication to alleviate his pain.

FALSE CLAIMS ACT COMPLAINT
FILED UNDER SEAL

133. Still trying to determine the extent of InnovAge's care-scheduling problem, Ms. Lapcewich requested the total number of outstanding orders. Alma Costello, a scheduler in San Bernardino, sent her a list limited to orders for outside consults and imaging consults. Of 975 orders, *852* of them – over 87% – had been outstanding for 30 days or more. *See* Exhibit 5 (emails about outstanding orders).

134. In October 2017, Ms. Hendren sent Ms. Lapcewich the results of an internal 2017 mock compliance audit of InnovAge's San Bernardino PACE center. That audit was led by Lori Rothwell, Chief Compliance Officer.

135. In the May 2017 mock audit, the condition "All orders are received and processed timely as appropriate" is flagged "Immediate Corrective Action Required" – carrying an "extreme" risk level. It notes that "scheduling is an urgent and large concern and is an ongoing concern since the last audit which was nine months ago."

136. Indeed, one finding noted: "almost 1,000 outstanding orders of which, many are over a year outstanding." The associated recommendation begins with: "Actual/potential delay in treatment is the consequence of outstanding orders."

137. Another condition, "Communication of new orders is done accurately and timely," is also flagged "Immediate Corrective Action Required" with an "extreme" risk level. It echoes the continuing concern with scheduling ordered care.

138. But many participants who tried to get medically necessary care were out of luck – because InnovAge did not routinely document grievance complaints as required, nor did it routinely inform participants of their grievance appeal rights. Ms. Lapcewich noted that InnovAge did not report all grievances to CMS.

139. To summarize: in many cases, InnovAge participants needed medically necessary care that they never received or received too late to prevent pain or harm. Ms. Lapcewich and others recognized that this systemic problem had been ongoing for years – and was never corrected before Ms. Lapcewich left in October 2017.

**INNOVAGE DOES NOT TIMELY PLAN PARTICIPANTS' CARE AS REQUIRED**

140. Not only did InnovAge fail to schedule care, Ms. Hendren explained in

23

1    her 2016 narrative that "47 care plans" were "now due or past due." *See* Exhibit 4. On

2    September 29, 28 care plans were incomplete but due the next day, and 19 more

3    enrollees joined October 1. There was a care-planning crisis at San Bernardino.

4    141.   Moreover, results of the subsequent May 2017 mock audit showed that

5    InnovAge's care-planning process still needed *immediate* corrective action:

6    142.   Among other things, that audit found that InnovAge failed to

7    appropriately review "wander risk concerns" bearing on participants' safety.

8    143.   InnovAge's failure to timely plan participants' care, in addition to its

9    failure to ensure they received all medically necessary care, put frail PACE

10   participants at risk, needlessly resulting in continued pain or worsening health.

11   **INNOVAGE FAILS TO APPROPRIATELY RESPOND TO SERVICE REQUESTS**

12   144.   In the InnovAge internal May 2017 mock audit, "Service Requests" is

13   flagged as requiring corrective action for multiple reasons:

14   145.   For 40% of the service delivery requests reviewed during the mock audit,

15   no documentation existed in participants' electronic medical records.

16   146.   Additionally, half of the reviewed service requests contained "no

17   documentation of notification of the participant" that the service request was denied.

18   147.   Alarmingly – and flagged for *immediate* corrective action – the audit

19   found that though interdisciplinary teams had approved home care, there were "no

20   home care notes in EMR as evidence of any home care being provided . . . Interviews

21   of home care RNs indicate that InnovAge does not obtain notes for home care or home

22   health from agencies."

23   148.   InnovAge (and Ms. Lapcewich) maintained documents confirming that

24   the company inappropriately denied participants' service requests.

25   149.   InnovAge failed to properly assess service requests, if it ever assessed

26   them at all. Moreover, InnovAge often did not timely notify participants that their

27   service requests were denied – leaving many seniors waiting for care that never came.

28   150.   Ms. Lapcewich observed that InnovAge knowingly withheld service

1  request documentation from CMS during an audit. This documentation included the
2  contents of a spreadsheet titled Services Delivery Requests Record, which contained
3  the following fields: participant name; the date a service request was received; the
4  category of the request; a description of the request; whether and when the request
5  was assessed; whether the request was approved or denied; when, if ever, the
6  participant was notified of the decision; whether that notification was written or oral;
7  and when, if ever, the requested service was provided.

8      151.  A 2016-2017 spreadsheet from the San Bernardino location shows
9  several service requests that were not timely assessed or decided upon – if ever at all.
10  It also reveals approved requests for which services were never provided.

11      152.  Ms. Lapcewich was asked to falsify data on InnovAge's service request
12  logs, but she would not do so.

13      153.  Speaking to the effect of InnovAge's rampant noncompliance, Kim
14  Hendren emailed Ms. Lapcewich on September 29, 2017, to reiterate the detrimental
15  effect it was having on PACE participants. An excerpt reads:

16          [PACE participant] submitted service requests three times in that past
17          year for a PMD. The PMD was denied all three requests due to an
18          inability to pass safety assessment. The safety assessment was failed due
19          to poor vision. Ophthalmology was ordered for evaluation and treatment
20          of poor vision due to cataracts over a year ago but was not scheduled
21          until recently. Consequently, the participant and his family are upset
22          because we have delayed meeting these needs for over a year.

23                                        ***

24          The original order to help this participants vision was not done timely. It
25          was not realized the ophthalmology appointment is essential to the
26          participants vision and mobility. The opportunity to help meet the
27          participant needs was missed with each service request for the PMD,
28          with each IDT member's six month and annual assessments, as well as

                                            25

1  during care planning conferences.

2  Ms. Lapcewich recalls that this was merely one example among many.

3  **INNOVAGE LACKS SUFFICIENT CONTRACTS WITH PROVIDERS**

4  154.  Very shortly after arriving at InnovAge, Ms. Lapcewich observed that

5  InnovAge did not have a sufficient provider network that would enable it to provide

6  all medically necessary care as required by PACE regulations.

7  155.  As evidence of this, InnovAge's May 2017 mock audit found that PACE

8  participants were concerned about "long delays to get specialist appointments."

9  156.  Dr. Frank Randolph, owner of Integrated LTC Medical Group

10  ("Integrated LTC"), sent InnovAge a letter titled "Considerations for Improving the

11  Provider Network for InnovAge-PACE of Greater San Bernardino." Integrated LTC

12  provided services to InnovAge PACE participants. *See* Exhibit 6 (Randolph letter).

13  157.  In his July 19, 2017 letter, Dr. Randolph set forth CMS's regulatory

14  requirements for contracted PACE services before expounding on the insufficiency

15  of InnovAge's provider network:

16  158.  He recounted that participants had "expressed frustration . . . with

17  consultant delays, inadequate care, or problems with f/u, or timely acquisition of

18  prescription medications ordered by consultants." He also noted that contracted

19  provider issues "will become a problem for InnovAge" as it continued to expand.

20  159.  One consequence of an insufficient provider network is an inability to

21  fulfill orders. Indeed, InnovAge's San Bernardino internal audits reveal exactly that:

22  160.  Its 2016 internal audit revealed hundreds of outstanding orders.

23  161.  Just one year later, its 2017 internal audit revealed that the problem had

24  worsened – San Bernardino now had over 1,000 unfulfilled orders.

25  162.  Ms. Lapcewich's informal September 2017 audit showed that 852 San

26  Bernardino orders were a month or more overdue.

27  163.  Ms. Lapcewich and Kim Hendren provided all of these audits to senior

28  management, including CEO Maureen Hewitt. As the number of unfulfilled orders

1    increased, InnovAge nonetheless relentlessly continued its nationwide expansion.

2    ### INNOVAGE FAILS TO TIMELY PROVIDE MEDICATIONS

3    164.   To make matters worse, InnovAge's May 2017 mock audit revealed that
4    it was not administering or ordering participants' medications "per policy."

5    165.   At a September 26, 2017 San Bernardino Participant Advisory
6    Committee ("PAC") meeting, PACE participants voiced concerns about medication
7    delivery. For example, one participant explained that he was running out of
8    medications because InnovAge was not timely delivering them – its medication
9    ordering system functioned poorly. *See* Exhibit 7 (PAC minutes).

10   166.   The PAC meeting minutes further note: "The medication issues have
11   been persistent since the start of the company. . . Medications need to be 100%
12   accurate, InnovAge needs to make the right changes for the safety of the ppt." *Id.*

13   167.   A September 28, 2017 email chain among InnovAge employees revealed
14   numerous issues with medications, including: a lack of transportation couriers to
15   timely deliver medications; PACE participants not being contacted about missed
16   medication deliveries; and prescriptions not being sent to pharmacies. *See* Exhibit 8.

17   168.   Ms. Lapcewich was already deeply troubled that InnovAge's participants
18   were not receiving ordered care, timely care-planning, or appropriate responses to
19   service requests. But she now also realized that many of them did not regularly receive
20   their medications – some of them life-saving.

21   ### INNOVAGE CHERRY-PICKS "HEALTHIER" ENROLLEES & ENCOURAGES
22   ### NEEDY PARTICIPANTS TO DISENROLL

23   169.   Ms. Lapcewich observed that InnovAge interdisciplinary teams
24   systematically denied enrollment to prospective PACE participants because of pre-
25   existing conditions or an expected high utilization of care. In other words, InnovAge
26   preferred to enroll healthier patients – resulting in increased profit.

27   170.   InnovAge management understood that it was cherry-picking enrollees:
28   Lisa Price, its medical director, asked Ms. Lapcewich to disenroll PACE participants

27

1    who were sent to nursing homes because nursing home stays were too expensive.

2    InnovAge was required to pay nursing homes for its participants' nursing home stays.

3         171.   PACE regulations strictly prohibit such cherry-picking due to health

4    status in the enrollment or disenrollment process; in fact, doing so is sanctionable.

5    (Notably, sanctions are also warranted for PACE organizations like InnovAge that

6    fail to substantially provide all medically necessary services.)

7         172.   Ms. Lapcewich observed that InnovAge made false statements and

8    misrepresentations to CMS in letters detailing its reasons for declining to enroll

9    potential participants who otherwise qualified for PACE. InnovAge falsely told CMS

10   that participants were not statutorily-eligible for PACE when they in fact were.

11        173.   InnovAge's Chief Medical Officer once asked Ms. Lapcewich to find

12   ways to disenroll participants who were accessing expensive nursing home care.

13        174.   Additionally, interdisciplinary team members recommended or

14   suggested disenrollment when a participant wanted or needed significant care.

15   **INNOVAGE FAILS TO COLLECT MEDI-CAL COST-SHARING PAYMENTS**

16        175.   Kalondrea Davis, Executive Director of InnovAge's San Bernardino

17   location, admitted to Ms. Lapcewich that the San Bernardino location did not collect

18   cost-sharing payments from Medi-Cal beneficiaries as it was required to do.

19        176.   Upon information and belief, InnovAge failed to adjust claimed

20   capitation amounts for Medi-Cal beneficiaries with a spend-down share of cost. That

21   adjustment should be reflected in claim submittals, since InnovAge is not entitled to

22   the portion of a capitation amount that a Medi-Cal beneficiary is responsible for.

23        **D.**    **InnovAge Knows of its Woeful Noncompliance & Fails to Correct It**

24        177.   Ms. Lapcewich confirmed with Kim Hendren that InnovAge took on

25   patients without the ability to adequately serve them. Ms. Hendren sent her internal

26   compliance audits evidencing noncompliance and InnovAge's inability to provide all

27   medically necessary services. Although Ms. Hendren had also sent these audits to

28   upper-level management, they had not corrected the noncompliance.

28

178. InnovAge detected noncompliance through internal monitoring, which the CEO and corporate officers knew about, yet it did not act upon its findings.

179. In the September 28, 2017 email chain that made its way to InnovAge's CEO that same day, Ms. Lapcewich and others flagged numerous "extremely concerning" compliance issues about medication processes, care planning, interdisciplinary team functionality, orders tracking, clinic operations, clinic outcomes, and public guardians' concerns. *See* Exhibit 8.

180. Throughout her short tenure at InnovAge, Ms. Lapcewich repeatedly reported compliance concerns to her boss, CEO Maureen Hewitt, and to Denise Triba, Chief People Officer, both in person and by emailing them multiple times.

181. For example, on October 9, 2017, she emailed them to explain that "the clinic is fundamentally failing," forwarding an email from Tracy Miller in which Ms. Miller had reached out to Ms. Lapcewich about "big issues in the clinic" that she could not solve because she had "not completed my own orientation. *See* Exhibit 9.

182. Ms. Miller observed that InnovAge had insufficient "organization, resources, and time to achieve appropriate staff training." Indeed, she told Ms. Lapcewich that she did not believe that existing employees, including nurses, had received proper training, and she was especially concerned that new hires would not receive proper training, either, as there were few policies and procedures in place. *Id.*

183. Early on, as Ms. Lapcewich realized that InnovAge was not operating in substantial compliance, she had several conversations with the Executive Director of InnovAge's San Bernardino location, Kalondrea Davis, about numerous areas needing improvement. On September 9, 2017, Ms. Lapcewich sent Ms. Davis a letter outlining expectations for improving non-compliant conditions, including: untimely grievance resolution, which a CMS audit had revealed; and untimely care-planning.

184. Just three days earlier, on September 6, 2017, a CMS account manager had emailed CEO Maureen Hewitt, Chief Compliance Officer Lori Rothwell, and Ms. Davis about the results of its August 2017 audit, which had "detected systemic

29

1  conditions of non-compliance that require immediate corrective action."

2       185.  The CMS email enumerated specific conditions it required InnovAge to

3  address. For some conditions, it required InnovAge to implement "immediate

4  corrective action" by September 11, 2017 – five days later. InnovAge had to come up

5  with a corrective action plan and explain how it had immediately corrected the

6  conditions and how it would "prevent the issues from recurring."

7       186.  InnovAge had to take corrective action by September 11 for failing to:

8     i.    Timely notify participants of decisions to approve or deny service

9            requests;

10     ii.   Include in denial notifications "the participant's right to appeal the

11            denial" and how to do so;

12     iii.  Conduct in-person assessments or reassessments when required to do so;

13     iv.  Include specific reasons for service denials;

14     v.   Ensure that interdisciplinary team members took part in care-planning;

15     vi.  Ensure that the interdisciplinary team conducted initial assessments upon

16            enrollment;

17       187.  While the higher-ups at InnovAge had known for years that InnovAge

18  had a systemic noncompliance problem (because its employees had repeatedly told

19  them about it), CMS was beginning to take notice.

20      **E.**    **InnovAge Hides Noncompliance as CMS Orders Corrective Action**

21       188.  However, instead of honestly adhering to the corrective action plan,

22  InnovAge's CEO ordered Ms. Lapcewich *to conceal from CMS* certain metrics

23  directly related to the mandated corrective action plan such as: service delivery

24  request records; reports revealing a failure to schedule appointments; or documents

25  showing it had not told participants why their service requests were denied.

26       189.  Ms. Lapcewich learned that InnovAge had been omitting or forging

27  information sent to CMS in prior yearly audits as well.

28       190.  Undeterred by the CMS corrective action deadline, InnovAge's systemic

FALSE CLAIMS ACT COMPLAINT
FILED UNDER SEAL

1  noncompliance continued. Despite Ms. Lapcewich's efforts to stop it, Maureen
2  Hewitt rebuked her, ordering her to keep data from CMS that might lead to penalties.

3    191.   In one of her last emails at InnovAge, Ms. Lapcewich told Maureen
4  Hewitt on October 15, 2017, about a PACE participant who had been adversely
5  affected by InnovAge's noncompliance. This patient had been waiting for "many
6  months" for a physician's order to see a specialist and to have a diagnostic procedure.
7  He and his advocate had tried to expedite the process but felt like they were "getting
8  the runaround." When that failed, they reached out to Ms. Lapcewich.

9    192.   This PACE participant told Ms. Lapcewich that he had been in "a great
10  deal of pain for months" and that while his doctor had ordered specialist and
11  diagnostic appointments months ago, InnovAge had never scheduled them.

12    193.   Despite a wealth of compliance concerns, InnovAge's board remained
13  intent to proceed with growth initiatives – expanding services despite being unable to
14  deliver all medically necessary care to the participants it was currently serving.
15  September 1, 2017 board materials show that InnovAge was pursuing or researching
16  expansion in: Virginia, California, Michigan, Pennsylvania, Kansas, and Tennessee.

17    194.   The InnovAge board also discussed driving growth "in existing PACE
18  programs" such as San Bernardino, which had achieved a 2017 census of 410 –
19  exceeding its goal of 405. Yet it could not compliantly or adequately serve them.

20    **F.    Ms. Lapcewich Is Constructively Discharged from InnovAge**

21    195.   As she tried for months to effectuate change, Ms. Lapcewich received
22  pushback from InnovAge leaders. Even though employees were reaching out to Ms.
23  Lapcewich about their own similar concerns, CEO Maureen Hewitt dismissed them.

24    196.    Ms. Lapcewich brought her concerns about systemic noncompliance to
25  InnovAge senior management, including the CEO, Chief People Officer, and Chief
26  Compliance Officer. She did so multiple times in person and over email.

27    197.   In an October 16, 2017 email to Chief People Officer Denise Triba and
28  CEO Maureen Hewitt, Ms. Lapcewich recounted how she had been reporting

FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

1 systemic noncompliance that had "been in existence for the past several years" and
2 that had never been brought to her attention before she began working at InnovAge.

3      198.  She explained that she had tried to resolve these issues but was "met with
4 punitive and retaliatory behavior." She felt threatened when, after raising concerns,
5 InnovAge management began investigating *her* – and not the health- and safety-
6 jeopardizing noncompliance she had ardently reported. Disturbingly, she arrived at
7 work one day to discover that the CEO had sent individuals to physically shadow her
8 and follow her around for three days *with no explanation*.

9      199.  In October 2017, InnovAge gave Ms. Lapcewich a choice: (1) resign or
10 (2) be terminated for "job abandonment."

11      200.  InnovAge had never given her an employee handbook or manual to guide
12 her through the process of disputing an allegation of job abandonment. To her
13 knowledge, InnovAge had no hearing procedures or policies to protect her.

14      201.  Without a process by which to dispute InnovAge's accusation that she
15 had abandoned her job, Ms. Lapcewich resigned from her position. She had uncovered
16 deep and serious issues of systemic noncompliance; she had dutifully and repeatedly
17 told InnovAge management about what she had found, including CEO Maureen
18 Hewitt; and she had been rebuked and thereafter investigated for doing so.

19      202.  After exhausting her efforts and refusing to be complicit in fraudulent
20 business, she surrendered to constructive discharge without another job lined up.

21     **G.   CMS Audit Results: InnovAge's California and Colorado PACE**
22              **Programs Score Fourth- and Ninth-Worst of All Audits in 2017**

23      203.  CMS's website contains PACE compliance audit results. In 2017, CMS
24 audited 74 PACE organizations – only seven of them operated for profit.

25      204.  InnovAge's California and Colorado PACE operations both scored
26 within the top ten 2017 audit scores – *a higher score being a worse result*.

27      205.  Its California operation (Contract #H6079) had an audit score of 4, the
28 ninth-highest overall audit score.

206.   Its Colorado operation (Contract #H0613) had an audit score of 5.2, the fourth-highest overall audit score.

207.   The average audit score was 2.4, with a standard deviation of 1.5.

208.   As to the number of conditions requiring corrective action ("CARS"), the California location had 6 (the seventeenth highest number), and the Colorado location had 8 (the tenth-highest number). A CAR is a systemic deficiency that must be corrected but does not immediately impact health and safety.

209.   As to the number of conditions requiring *immediate* corrective action ("ICARS"), the California location had seven (the ninth-highest number), and the Colorado location had nine (the fourth-highest number). An ICAR is a systemic deficiency so severe that it requires immediate corrective action, indicating a deficiency that reduces access to care or poses an immediate health or safety threat.

210.   According to CMS's 2017 PACE Audit and Enforcement report, the average PACE organization census is 381. InnovAge's Colorado PACE organization "had the second largest population of any PACE Organization at 3,046 participants" – *eight times* the average size.

211.   In light of the facts set forth above, InnovAge's 2017 audit results are unsurprising. What *is* surprising is that InnovAge actively and knowingly avoided correcting noncompliance as it was required to do. And not only did its systemic noncompliance continue, it encouraged Ms. Lapcewich to hide from CMS the data that proves it. All the while, InnovAge continued to expand, with each new participant bringing in capitated revenue for all-inclusive care that it knowingly did not deliver.

## **FIRST CAUSE OF ACTION**

### As to <u>All Defendants</u>

**(False Claims in Violation of the Federal False Claims Act)**

**31 U.S.C. § 3729(a)(1)(A)**

212.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

33

213.   As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for all-inclusive capitated payments for PACE services from the United States in violation of 31 U.S.C. § 3729(a)(1)(A). Defendants were not entitled to payment because they falsely certified compliance with material federal and state regulations enacted to protect patients' health and safety, including 42 C.F.R. part 460. They knew they were substantially noncompliant with applicable regulations and their PACE agreements with the Government – yet they failed to report that noncompliance.

214.   Defendants' certifications and misrepresentations were "material" and "knowing" as defined by the federal False Claims Act.

215.   As a result of Defendants' misconduct, the United States incurred damages through payment of false claims by its Medicare and Medicaid programs, which reimbursed Defendants for false and fraudulent claims.

216.   Defendants are jointly and severally liable to the United States under the Federal False Claims Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,000 to $10,000 (adjusted for inflation) for each false claim they presented or caused to be presented for payment.

## SECOND CAUSE OF ACTION

### As to All Defendants

**(False Records or Statements Material to False Claims in Violation of the Federal False Claims Act)**

**31 U.S.C. § 3729(A)(1)(B)**

217.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

218.   As set forth above, and at all relevant times, Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

219.   Specifically, Defendants falsified or omitted information submitted to

34

1  CMS in yearly audits and in connection with a corrective action plan mandated after
2  CMS's 2017 audit. They also submitted reasons to CMS for denying enrollment to
3  prospective PACE participants that were patently false. By engaging in such conduct,
4  they thereby fraudulently maintained an ability to receive Government reimbursement
5  and fraudulently supported the presentation of false claims to the United States.

6      220.   Moreover, Defendants made it appear as though they were providing all-
7  inclusive care to PACE participants in compliance with state and federal regulations
8  when they knowingly were not. Instead, they made material false statements to the
9  Government in connection with claims for Government payment which were not
10 accurate, complete, or truthful.

11     221.   As a result of Defendants' misconduct, the United States incurred
12 damages through payment of false claims by its Medicare and Medicaid programs to
13 Defendants, who were not entitled to reimbursement.

14     222.   Defendants are jointly and severally liable to the United States under the
15 federal False Claims Act for treble damages in an amount to be determined at trial,
16 plus a civil penalty of $5,000 to $10,000 (adjusted for inflation) for each false record
17 or statement they made, used, or caused to be made or used that were material to false
18 or fraudulent claims.

19                    **THIRD CAUSE OF ACTION**
20              As to <u>InnovAge</u> and <u>InnovAge San Bernardino</u>
21          **(Retaliation in Violation of the Federal False Claims Act)**
22                        **31 U.S.C. § 3730(h)(1)**

23     223.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous
24 paragraphs as if fully set forth herein.

25     224.   Defendants InnovAge and InnovAge San Bernardino retaliated against
26 Ms. Lapcewich by, among other things, constructively discharging her as a result of
27 lawful acts done in furtherance of this action, including: refusing to engage in
28 Defendants' fraudulent scheme to maximize Government reimbursement they were

35

FALSE CLAIMS ACT COMPLAINT<br>FILED UNDER SEAL

1 not entitled to; refusing to falsify or omit information Defendants were required to
2 report to CMS; and refusing to substantially comply with state and federal regulations
3 even when CMS specifically mandated them to do so.

4     225. As a direct and proximate result of this unlawful and retaliatory
5 constructive discharge, Ms. Lapcewich suffered economic damages and future lost
6 wages and benefits, in an amount to be determined at trial.

7     226. Pursuant to 31 U.S.C. § 3730(h), Ms. Lapcewich is entitled to litigation
8 costs and reasonable attorney's fees incurred in the pursuit of her retaliation claim.

9 **FOURTH CAUSE OF ACTION**
10 As to Defendants <u>InnovAge</u> & <u>InnovAge San Bernardino</u>
11 **(False Claims in Violation of the California False Claims Act)**
12 **CAL. GOV'T CODE § 12651(a)(1)**

13     227. Ms. Lapcewich re-alleges and incorporates the allegations in all previous
14 paragraphs as if fully set forth herein.

15     228. As set forth above, Defendants InnovAge and InnovAge San Bernardino
16 knowingly presented or caused to be presented false or fraudulent claims for all-
17 inclusive capitated payments for PACE services from the State of California in
18 violation of CAL. GOV'T CODE § 12651(a)(1). Defendants were not entitled to
19 payment because they falsely certified compliance with material federal and state
20 regulations enacted to protect patients' health and safety, including 42 C.F.R. part
21 460. They knew they were substantially noncompliant with applicable regulations and
22 their PACE agreements with the Government – yet they failed to report that
23 noncompliance. Moreover, they submitted false claims for full capitation payments
24 for Medi-Cal beneficiaries with spend-down liability that they failed to offset.

25     229. Defendants' certifications and misrepresentations were "material" and
26 "knowing" as defined by the California False Claims Act.

27     230. As a result of Defendants' misconduct, the State of California incurred
28 damages through payment of false claims by its Medicaid program, which reimbursed

1    Defendants for false and fraudulent claims.

2        231.   Defendants are jointly and severally liable to the State of California

3    under the California False Claims Act for treble damages in an amount to be

4    determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation)

5    for each false claim they presented or caused to be presented for payment.

6    **FIFTH CAUSE OF ACTION**

7    As to Defendants <u>InnovAge</u> and <u>InnovAge San Bernardino</u>

8    **(False Records or Statements Material to False Claims in Violation of the**

9    **California False Claims Act)**

10   **CAL. GOV'T CODE § 12651(a)(2)**

11       232.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous

12   paragraphs as if fully set forth herein.

13       233.   As set forth above, and at all relevant times, Defendants InnovAge and

14   InnovAge San Bernardino knowingly made, used, or caused to be made or used, false

15   records or statements that were material to false or fraudulent claims in violation of

16   CAL. GOV'T CODE § 12651(a)(2).

17       234.   Specifically, Defendants falsified or omitted information submitted to

18   CMS in yearly audits and in connection with a corrective action plan mandated after

19   CMS's 2017 audit. They also submitted reasons to CMS for denying enrollment to

20   prospective PACE participants that were patently false. By engaging in such conduct,

21   they thereby fraudulently maintained an ability to receive Government reimbursement

22   and fraudulently supported the presentation of false claims to the State of California.

23       235.   Moreover, Defendants made it appear as though they were providing all-

24   inclusive care to PACE participants in compliance with state and federal regulations

25   when they knowingly were not. Instead, they made material false statements to the

26   Government in connection with claims for Government payment which were not

27   accurate, complete, or truthful. They also failed to offset Medi-Cal beneficiaries'

28   spend-down liability from submitted capitation claims as they were required to do.

37
FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

236.   As a result of Defendants' misconduct, the State of California incurred damages through payment of false claims by its Medicaid program to Defendants, who were not entitled to reimbursement.

237.   Defendants are jointly and severally liable to the State of California under the California False Claims Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation) for each false record or statement they made, used, or caused to be made or used that were material to false or fraudulent claims.

## SIXTH CAUSE OF ACTION

As to Defendants <u>InnovAge</u> and <u>InnovAge San Bernardino</u>

**(Retaliation in Violation of the California False Claims Act)**

**CAL. GOV'T CODE § 12653**

238.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

239.   Defendants InnovAge and InnovAge San Bernardino retaliated against Ms. Lapcewich by, among other things, constructively discharging her as a result of lawful acts done in furtherance of this action, including: refusing to engage in Defendants' fraudulent scheme to maximize Government reimbursement they were not entitled to; refusing to falsify or omit information Defendants were required to report to CMS; and refusing to substantially comply with state and federal regulations even when CMS specifically mandated them to do so.

240.   As a direct and proximate result of this unlawful and retaliatory constructive discharge, Ms. Lapcewich suffered economic damages and future lost wages and benefits, in an amount to be determined at trial.

241.   Ms. Lapcewich is entitled to litigation costs and reasonable attorney's fees incurred in pursuit of her retaliation claim. CAL. GOV'T CODE § 12653(b).

## SEVENTH CAUSE OF ACTION

As to Defendants <u>InnovAge</u>, <u>InnovAge Colorado</u>, and <u>InnovAge Loveland</u>

38

**(False Claims in Violation of the Colorado Medicaid False Claims Act)**

COLO. REV. STAT. § 25.5-4-305(1)(a)

242. Ms. Lapcewich re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

243. As set forth above, Defendants InnovAge, InnovAge Colorado, and InnovAge Loveland knowingly presented or caused to be presented false or fraudulent claims for all-inclusive capitated payments for PACE services from the State of Colorado in violation of COLO. REV. STAT. § 25.5-4-305(1)(a). Defendants were not entitled to payment because they falsely certified compliance with material federal and state regulations enacted to protect patients' health and safety, including 42 C.F.R. part 460. They knew they were substantially noncompliant with applicable regulations and their PACE agreements with the Government – yet they failed to report that noncompliance.

244. Defendants' certifications and misrepresentations were "material" and "knowing" as defined by the Colorado Medicaid False Claims Act.

245. As a result of Defendants' misconduct, the State of Colorado incurred damages through payment of false claims by its Medicaid program, which reimbursed Defendants for false and fraudulent claims.

246. Defendants are liable to the State of Colorado under the Colorado Medicaid False Claims Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation) for each false claim they presented or caused to be presented for payment.

## EIGHTH CAUSE OF ACTION

As to Defendants InnovAge, InnovAge Colorado, and InnovAge Loveland

**(False Records or Statements Material to False Claims in Violation of the**

**Colorado Medicaid False Claims Act)**

COLO. REV. STAT. § 25.5-4-305(1)(b)

247. Ms. Lapcewich re-alleges and incorporates the allegations in all previous

39

1 | paragraphs as if fully set forth herein.

2 | 248. As set forth above, and at all relevant times, Defendants InnovAge,

3 | InnovAge Colorado, and InnovAge Loveland knowingly made, used, or caused to be

4 | made or used, false records or statements that were material to false or fraudulent

5 | claims in violation of COLO. REV. STAT. § 25.5-4-305(1)(b).

6 | 249. Specifically, Defendants made it appear as though they were providing

7 | all-inclusive care to PACE participants in compliance with state and federal

8 | regulations when they knowingly were not. Instead, they made material false

9 | statements to the Government in connection with claims for Government payment

10 | which were not accurate, complete, or truthful. By engaging in such conduct, they

11 | thereby fraudulently maintained an ability to receive Government reimbursement and

12 | fraudulently supported the presentation of false claims to the State of Colorado.

13 | 250. As a result of Defendants' misconduct, the State of Colorado incurred

14 | damages through payment of false claims by its Medicaid program to Defendants,

15 | who were not entitled to reimbursement.

16 | 251. Defendants are liable to the State of Colorado under the California False

17 | Claims Act for treble damages in an amount to be determined at trial, plus a civil

18 | penalty of $5,500 to $11,000 (adjusted for inflation) for each false record or statement

19 | they made, used, or caused to be made or used that were material to false or fraudulent

20 | claims.

21 | **NINTH CAUSE OF ACTION**

22 | As to Defendants <u>InnovAge</u> and <u>InnovAge Albuquerque</u>

23 | **(False Claims in Violation of the New Mexico Fraud Against Taxpayers Act)**

24 | **N.M. STAT. ANN. § 44-9-3(A)(1)**

25 | 252. Ms. Lapcewich re-alleges and incorporates the allegations in all previous

26 | paragraphs as if fully set forth herein.

27 | 253. As set forth above, Defendants InnovAge and InnovAge Albuquerque

28 | knowingly presented or caused to be presented false or fraudulent claims for all-

40

1 | inclusive capitated payments for PACE services from the State of New Mexico in
2 | violation of N.M. STAT. ANN. § 44-9-3(A)(1). Defendants were not entitled to
3 | payment because they falsely certified compliance with material federal and state
4 | regulations enacted to protect patients' health and safety, including 42 C.F.R. part
5 | 460. They knew they were substantially noncompliant with applicable regulations and
6 | their PACE agreements with the Government – yet they failed to report that
7 | noncompliance.

8 |     254.   Defendants' certifications and misrepresentations were "material" and
9 | "knowing" as defined by the New Mexico Fraud Against Taxpayers Act.

10 |     255.   As a result of Defendants' misconduct, the State of New Mexico incurred
11 | damages through payment of false claims by its Medicaid program, which reimbursed
12 | Defendants for false and fraudulent claims.

13 |     256.   Defendants are jointly and severally liable to the State of New Mexico
14 | under the New Mexico Fraud Against Taxpayers Act for treble damages in an amount
15 | to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim
16 | they presented or caused to be presented for payment.

17 | **TENTH CAUSE OF ACTION**
18 | As to Defendants <u>InnovAge</u> and <u>InnovAge Albuquerque</u>
19 | **(False Records or Statements to Support Payment on False Claims in Violation**
20 | **of the New Mexico Fraud Against Taxpayers Act)**
21 | **N.M. STAT. ANN. § 44-9-3(A)(2)**

22 |     257.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous
23 | paragraphs as if fully set forth herein.

24 |     258.   As set forth above, and at all relevant times, Defendants InnovAge and
25 | InnovAge Albuquerque knowingly made, used, or caused to be made or used, false
26 | records or statements that were material to false or fraudulent claims in violation of
27 | N.M. STAT. ANN. § 44-9-3(A)(2).

28 |     259.   Specifically, Defendants made it appear as though they were providing

all-inclusive care to PACE participants in compliance with state and federal regulations when they knowingly were not. Instead, they made material false statements to the Government in connection with claims for Government payment which were not accurate, complete, or truthful. By engaging in such conduct, they thereby fraudulently maintained an ability to receive Government reimbursement and fraudulently supported the presentation of false claims to the State of New Mexico.

260.   As a result of Defendants' misconduct, the State of New Mexico incurred damages through payment of false claims by its Medicaid program to Defendants, who were not entitled to reimbursement.

261.   Defendants are jointly and severally liable to the State of New Mexico under the New Mexico Fraud Against Taxpayers Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false record or statement they made, used, or caused to be made or used that were material to false or fraudulent claims.

## ELEVENTH CAUSE OF ACTION

As to Defendants InnovAge and InnovAge Albuquerque

**(False Claims in Violation of the New Mexico Medicaid False Claims Act)**

**N.M. STAT. ANN. § 27-14-4(A)**

262.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

263.   As set forth above, Defendants InnovAge and InnovAge Albuquerque knowingly presented or caused to be presented false or fraudulent claims for all-inclusive capitated payments for PACE services from the State of New Mexico in violation of N.M. STAT. ANN. § 27-14-4(A). Defendants were not entitled to payment because they falsely certified compliance with material federal and state regulations enacted to protect patients' health and safety, including 42 C.F.R. part 460. They knew they were substantially noncompliant with applicable regulations and their PACE agreements with the Government – yet they failed to report that

42

1   noncompliance.

2       264.  Defendants' certifications and misrepresentations were "material" and
3   "knowing."

4       265.  As a result of Defendants' misconduct, the State of New Mexico incurred
5   damages through payment of false claims by its Medicaid program, which reimbursed
6   Defendants for false and fraudulent claims.

7       266.  Defendants are liable to the State of New Mexico under the New Mexico
8   Medicaid False Claims Act for treble damages in an amount to be determined at trial.

9   **TWELFTH CAUSE OF ACTION**

10   As to Defendants <u>InnovAge</u> and <u>InnovAge Albuquerque</u>

11   **(False Records or Statements to Obtain a False Claim in Violation of the New**
12   **Mexico Medicaid False Claims Act)**

13   **N.M. STAT. ANN. § 27-14-4(C)**

14       267.  Ms. Lapcewich re-alleges and incorporates the allegations in all previous
15   paragraphs as if fully set forth herein.

16       268.  As set forth above, and at all relevant times, Defendants InnovAge and
17   InnovAge Albuquerque knowingly made, used, or caused to be made or used, false
18   records or statements that were material to false or fraudulent claims in violation of
19   CAL. GOV'T CODE § 12651(a)(2).

20       269.  Specifically, Defendants made it appear as though they were providing
21   all-inclusive care to PACE participants in compliance with state and federal
22   regulations when they knowingly were not. Instead, they made material false
23   statements to the Government in connection with claims for Government payment
24   which were not accurate, complete, or truthful. By engaging in such conduct, they
25   thereby fraudulently maintained an ability to receive Government reimbursement and
26   fraudulently supported the presentation of false claims to the State of New Mexico.

27       270.  Moreover, Defendants made it appear as though they were providing all-
28   inclusive care to PACE participants in compliance with state and federal regulations

43

FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

1   when they knowingly were not. Instead, they made material false statements to the

2   Government in connection with claims for Government payment which were not

3   accurate, complete, or truthful.

4       271.  As a result of Defendants' misconduct, the State of New Mexico incurred

5   damages through payment of false claims by its Medicaid program to Defendants,

6   who were not entitled to reimbursement.

7       272.  Defendants are liable to the State of New Mexico under the New Mexico

8   Medicaid False Claims Act for treble damages in an amount to be determined at trial.

9                       **THIRTEENTH CAUSE OF ACTION**

10  As to Defendants <u>InnovAge</u> and <u>InnovAge Roanoke</u>

11  **(False Claims in Violation of the Virginia Fraud Against Taxpayers Act)**

12  **VA. CODE ANN. § 8.01-216.3(A)(1)**

13      273.  Ms. Lapcewich re-alleges and incorporates the allegations in all previous

14  paragraphs as if fully set forth herein.

15      274.  As set forth above, Defendants InnovAge and InnovAge Roanoke

16  knowingly presented or caused to be presented false or fraudulent claims for all-

17  inclusive capitated payments for PACE services from the State of Virginia in violation

18  of VA. CODE ANN. § 8.01-216.3(A)(1). Defendants were not entitled to payment

19  because they falsely certified compliance with material federal and state regulations

20  enacted to protect patients' health and safety, including 42 C.F.R. part 460. They

21  knew they were substantially noncompliant with applicable regulations and their

22  PACE agreements with the Government – yet they failed to report that

23  noncompliance.

24      275.  Defendants' certifications and misrepresentations were "material" and

25  "knowing" as defined by the Virginia Fraud Against Taxpayers Act.

26      276.  As a result of Defendants' misconduct, the State of Virginia incurred

27  damages through payment of false claims by its Medicaid program, which reimbursed

28  Defendants for false and fraudulent claims.

44

1    277.   Defendants are liable to the State of Virginia under the Virginia Fraud
2   Against Taxpayers Act for treble damages in an amount to be determined at trial, plus
3   a civil penalty of $10,957 to $21,916 (adjusted for inflation) for each false claim they
4   presented or caused to be presented for payment.

5   **FOURTEENTH CAUSE OF ACTION**
6   As to Defendants <u>InnovAge</u> and <u>InnovAge Roanoke</u>
7   **(False Records or Statements Material to False Claims in Violation of the**
8   **Virginia Fraud Against Taxpayers Act)**
9   VA. CODE ANN. § 8.01-216.3(A)(2)

10    278.   Ms. Lapcewich re-alleges and incorporates the allegations in all previous
11   paragraphs as if fully set forth herein.

12    279.   As set forth above, and at all relevant times, Defendants InnovAge and
13   InnovAge Roanoke knowingly made, used, or caused to be made or used, false
14   records or statements that were material to false or fraudulent claims in violation of
15   VA. CODE ANN. § 8.01-216.3(A)(2).

16    280.   Specifically, Defendants made it appear as though they were providing
17   all-inclusive care to PACE participants in compliance with state and federal
18   regulations when they knowingly were not. Instead, they made material false
19   statements to the Government in connection with claims for Government payment
20   which were not accurate, complete, or truthful. By engaging in such conduct, they
21   thereby fraudulently maintained an ability to receive Government reimbursement and
22   fraudulently supported the presentation of false claims to the State of Virginia.

23    281.   As a result of Defendants' misconduct, the State of Virginia incurred
24   damages through payment of false claims by its Medicaid program to Defendants,
25   who were not entitled to reimbursement.

26    282.   Defendants are liable to the State of Virginia under the Virginia Fraud
27   Against Taxpayers Act for treble damages in an amount to be determined at trial, plus
28   a civil penalty of $10,957 to $21,916 (adjusted for inflation) for each false record or

1   statement they made, used, or caused to be made or used that were material to false
2   or fraudulent claims.

3   **VI.   DEMAND FOR JURY TRIAL**

4       283.   Relator Karen Lapcewich, on behalf of herself, the United States of
5   America, and the States of California, Colorado, New Mexico, and Virginia, demands
6   a jury trial on all claims alleged herein.

7   **VII.   PRAYER FOR RELIEF**

8       WHEREFORE, Relator Karen Lapcewich, on behalf of the United States and
9   the States of California, Colorado, New Mexico, and Virginia, prays this Court to:

10       (a)   Order Defendants to cease and desist from submitting false or fraudulent
11   claims to the United States in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B);

12       (b)   Enter judgment against Defendants, jointly and severally, for a civil
13   penalty of $10,000 (adjusted for inflation as required by the Bipartisan Budget Act of
14   2015) for each violation of the federal False Claims Act that Defendants committed;

15       (c)   Enter judgment against Defendants, jointly and severally, for three times
16   the amount of damages sustained by the United States because of Defendants' acts;

17       (d)   Order Defendants to cease and desist from submitting false or fraudulent
18   claims to the States of California, Colorado, New Mexico, and Virginia in violation
19   of CAL. GOV'T CODE §§ 12651(a)(1) and (a)(2); COLO. REV. STAT. §§ 25.5-4-
20   305(1)(a) and (1)(b); N.M. STAT. ANN. §§ 44-9-3(A)(1) and (A)(2); N.M. STAT. ANN.
21   §§ 27-14-4(A) and (C); and VA. CODE ANN. §§ 8.01-216.3(A)(1) and (A)(2);

22       (e)   Enter judgment against Defendants for the maximum amount of civil
23   penalties allowed for each violation of the California False Claims Act, the Colorado
24   Medicaid False Claims Act, the New Mexico Fraud Against Taxpayers Act, and the
25   Virginia Fraud Against Taxpayers Act that Defendants committed;

26       (f)   Enter judgment against Defendants for three times the amount of
27   damages sustained by the States of California, Colorado, New Mexico, and Virginia
28   because of Defendants' acts;

FALSE CLAIMS ACT COMPLAINT
**FILED UNDER SEAL**

(g)     Enter judgment against Defendants in an amount equal to twice the economic damages Relator has suffered, plus interest, as well as compensation for her future lost wages and benefits resulting from Defendants' unlawful retaliation;

(h)     Award Relator the maximum percentage of any recovery allowed to her pursuant to the federal False Claims Act, the California False Claims Act, the Colorado Medicaid False Claims Act, the New Mexico Fraud Against Taxpayers Act, the New Mexico Medicaid False Claims Act, and the Virginia Fraud Against Taxpayers Act, including costs and reasonable attorneys' fees for prosecuting this important action; and

(i)     Enter such other relief as this Court deems proper.

                              Respectfully submitted,


DATED: July 25, 2019          WATERS, KRAUS, & PAUL
                              Michael L. Armitage

                              WATERS & KRAUS, LLP
                              Charles S. Siegel
                              Taryn E. Ourso

                              BARTLETT BARROW LLP
                              Brian P. Barrow
                              Jennifer L. Bartlett


                    By: _____
                              Jennifer L. Bartlett
                              *Attorneys for Relator*

47

# EXHIBIT 1

EXHIBIT 1

48

## Designation of InnovAge Affiliated Covered Entity

The Health Insurance Portability and Accountability Act of 1996 and the rules enacted thereunder ("HIPAA") permits all Covered Entities under common ownership or control to designate themselves a single Affiliated Covered Entity for purposes of complying with HIPAA. "Common control" exists if an entity, such as Total Community Options, Inc., has the power, directly or indirectly, to influence or direct the actions or policies of the other entities.

**Affiliated Covered Entities**

The following Covered Entities under the common control of Total Community Options, Inc., a Colorado corporation, are hereby designated as part of a single Affiliated Covered Entity for purposes of HIPAA:

- Total Longterm Care, Inc. (d/b/a InnovAge Colorado PACE and InnovAge California PACE)
- Total Community Care, LLC (d/b/a InnovAge New Mexico PACE)
- Seniors! Inc. (d/b/a InnovAge Home Care)
- InnovAge Home Care North, LLC
- InnovAge Home Care – Aspen, LLC
- InnovAge Virginia PACE-Roanoke Valley, LLC
- InnovAge Pennsylvania LIFE, LLC (d/b/a InnovAge Pennsylvania LIFE – Allegheny, InnovAge Pennsylvania LIFE – Germantown, InnovAge Pennsylvania LIFE – Roosevelt and InnovAge Pennsylvania LIFE – St. Bart's)
- InnovAge Virginia PACE II, LLC (d/b/a InnovAge Virginia PACE – Richmond and InnovAge Virginia PACE – Peninsula)
- InnovAge Virginia PACE – Charlottesville, LLC (d/b/a InnovAge Virginia PACE – Blue Ridge)

This designation is effective September 23, 2013, and will remain effective until rescinded. This designation may be modified from time to time as needed in order to reflect the current makeup of the Affiliated Covered Entity.

EXHIBIT 1

31505068v1 2522

# EXHIBIT 2

EXHIBIT 2

50

**Do I Qualify?**

## Subscribe

Get the latest posts delivered to your inbox.

Email address



# Infographic: InnovAge PACE by the Numbers

JANUARY 31, 2019

With 10,000 people turning 65 every day, it's more important than ever that we meet the rising demand for high-quality senior care in the United States.

At InnovAge, we've seen first-hand how the Program of All-inclusive Care for the Elderly (PACE) can be part of the solution, and we are committed to spreading awareness of this vital program throughout our community.

Check out this infographic for some helpful statistics about InnovAge PACE.

## Browse by Category

**Most Recent**

Aging in Place

Caregiving

Health & Wellness

News

Stories & Culture

EXHIBIT 2



**Browse by Month**

2019

2018

2017

Older

**Search Posts**



**Nationally**

**120+**
**PACE Programs**
OPERATING 250+ PACE CENTERS
IN 31 STATES | SERVING 43,000+ PARTICIPANTS

**InnovAge PACE**

**16** centers | **5** states | **1,600+** employees

**5,000+**
**InnovAge PACE**
**Participants**
THE LARGEST PACE
PROVIDER IN THE U.S.

**In an average month, an**
**InnovAge PACE participant**
receives **8** prescriptions
has **4** primary care visits
visits the PACE center **11** times

**92%**
**flu vaccination rate**
**90%**
**pneumonia vaccination rate**

EXHIBIT 2



## At each InnovAge PACE center, participants have significant medical complexities*

Up to 65% have dementia

Up to 48% have diabetes

Up to 55% have chronic obstructive pulmonary disorder

Up to 27% have heart failure

*rates vary based on geography, ethnicity, and age



**Hospital readmission rate**
**30-day all cause**

**16%**

**Less than 1 ER VISIT** per year

**88%** have advance directives

An **advance directive** is a written statement of a person's wishes regarding medical treatment to ensure those wishes are carried out if they become unable to communicate them to a doctor.



**68% WOMEN**
**32% MEN**
Average Age: 75 years

Explore **frequently asked questions** about the **Program of All-inclusive Care for the Elderly (PACE)**.

If you think PACE may be a fit for you or someone you know, complete this **self-assessment** and have a senior care expert contact

53

EXHIBIT 2

**you directly to learn more.**

 

## Elevating National Awareness of the Program of All-inclusive Care for the Elderly

—————

SEPTEMBER 27, 2018

This year, InnovAge is proud to partner with the Alliance for Health Policy (AHP) for their series of discussions on ...

read more

## Making the Case for PACE

—————

MAY 22, 2018

At InnovAge, our passion for the Program of All-inclusive Care for the Elderly (PACE) is clear. We believe strongly i...

read more

—————————————————————

BLOG

LOCATIONS

CONTACT US

☐ ☐ ☐

Participant Rights

Notice of Privacy Practices

Nondiscrimination and Language

EXHIBIT 2

CAREERS

FAQ

8950 E. Lowry Boulevard
Denver, CO 80230
844-704-9613 TTY: 711
M-F  8 a.m. - 5 p.m. MT

Services

Privacy Statement

InnovAge Affiliated Covered Entity

Service Area Zip Codes

H0613_H1239_H5213_H6079_30220_InnovAgeWeb_CMSApproved_10/23/2017_H9830_30220_InnovAgeWeb_CMSApproved_9/14/2018_H8655_30220_InnovAgeWeb_CMSApproved_1_3_19_H3473_30220_InnovAgeWeb_CMSApproved_1_7_19

EXHIBIT 2

55

# EXHIBIT 3

EXHIBIT 3

56



From: KLapcewich@myinnovage.org
To: lapcewich@aol.com
Sent: 10/5/2017 10:32:07 AM Pacific Standard Time
Subject: FW: IGCAP 9/2016


**From:** Hendren, Kimberlyn
**Sent:** Tuesday, October 03, 2017 10:40 AM
**To:** Lapcewich, Karen <KLapcewich@myinnovage.org>
**Subject:** FW: IGCAP 9/2016

EXHIBIT 3

**From:** Hendren, Kimberlyn
**Sent:** Saturday, October 01, 2016 10:29 PM
**To:** Rothwell, Lori <<u>LRothwell@myinnovage.org</u>>
**Subject:** IGCAP 9/2016

Hi Lori,

Please find my mock audit reports attached. Lisa and Brad each said they were interested to see what I found. Considering the sensitivity of my report, I am sending it only to you. I will send my narrative report to them as well if you approve me to do so.

Thank you,
Kim

**Kimberlynn Hendren, RN, BSN, MS**
Corporate Director of Clinical Training
**InnovAge**
8950 Lowry Blvd.
Denver, CO 80230
Cell: 303-386-2720
Fax: 720-917-3414
<u>khendren@myinnovage.org</u>
<u>www.MyinnovAge.org</u>

**NOTICE TO RECIPIENT**: This electronic mail may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). If you are not the intended recipient of this email, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this message in error, please notify the sender immediately by reply email. Please then delete the original message and attachments without reading, forwarding or saving them.
Thank you.

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.



IGCAP Narrative Audit Review9-16.docx



IGCAP 9-2016Clinic InfCntl Mock Audit.xlsx

IGCAPMedicationRoom Audit 9-2016.docx

EXHIBIT 3

# EXHIBIT 4

EXHIBIT 4

59

IGCAP – Clinical Mock Audit 9/ 28 & 29 /2016

Overall great improvements since the audit in March of this year. The clinic atmosphere by itself felt pleasant and calm compared to the anxiousness demonstrated in March. The audit in March resulted with a large number of infection control concerns, a multitude of expired medications and supplies, HIPAA issues, and safety concerns due to lack of secure doors, of which almost all have been corrected.

The nurse manager appears to be very competent with good leadership skills as partly evidenced by obvious approachability from staff and flexibility demonstrated. Clinic staff seemed knowledgeable of their roles and expectations. The clinic staff appeared to be a cohesive group and worked well together. Additionally, the clinic appeared organized and clean.

Below are the concerns and out of compliance items identified.

**Actual or Potential delay of treatment:**
Outside scheduling was found to be an extremely large concern. Hundreds of appointments for outside specialists need to be made. Concerns and recommendations are written below.

> In review of one random order for gynecology, it was noted the appointment was for evaluation of heavy bleeding and the order was from 11/2015. According to Orders Tracking notes, the appointment occurred on 11/30/2015. In review of the 11/30/2015 documentation scanned into the EMR, an emergency room visit was scanned in dated 12/26/2015. No documentation for the gynecology appointment could be found.

> In morning meeting a labeled "drug seeker" was reported to be requesting more pain medication. He has an old broken ankle with internal fixation and now suffers from osteoarthritis and boney overgrowth in the ankle. The ankle is reported as "huge." The team identified an orthopedic consult has an outstanding order waiting to be scheduled.

> Orders for all outside consultants range from present to greater than 300 days out. I was informed the plan is to prioritize making the needed appointments by specialty starting with four selected specialties of which gynecology nor orthopedics were on the selected list. Additional prioritization should be considered as evidenced by the two examples above.

> Recommendation: (Note –The below efforts could also be done for lab orders.)
> - Review the list with primary care in an effort to identify outstanding orders in an effort to eliminate duplications.

EXHIBIT 4

60

- HIM help look for any reports from outside appointments that may have actually occurred but not documented nor closed out in the orders tracking system.
- Many outstanding orders occurred before the ppts last PA. Determine a reasonable and safe number of days for orders to be discontinued. Then during the next PA, the orders can be written again if the outside consultation is determined as necessary.
- Look for any outstanding orders when documenting in a ppt chart for any reason. If an outstanding order is found, discuss it with primary care and the outside scheduler as appropriate. Discontinue old orders and write new ones as necessary.
- Orders tracking training for all employees who use it.

In Thursday's morning meeting, a ppt was discussed who fell the week prior and was seen in the ED. He has been non-wt bearing on the left leg and is crawling through the house. PT assessed the ppt in the home on Wednesday, the day before mm. It was decided in morning meeting to x-ray the left leg. Transportation was also determined.

Care plans continue to be behind. On September 29th, there were approximately 28 care plans still due by September 30th and 19 enrollees were anticipated for October 1st. Obviously meaning, approximately 47 care plans now due or past due.

Within the bulleted findings below, the most concerning include infection control process and emergency processes.

**Infection Control:**
- Need to identify clear employee and participant infection control processes:
  - o Who, what, and how to report infections appears to be unclear amongst clinical staff.
  - o Employee and ppt infection tracking and trending needs to be identified.
  - o Reminded to refer to infection control P&P in Policy Manager.
  - o Infection control log needs further development.
    - ▪ Currently only 17 infestations and 3 infections entered into log back to April 2016. No other documentation found.
- Recommendation:
  - o Collaborate with pharmacist to identify antibiotics prescribed, then refer to EMR to document infections in binder.
  - o Nurse manager and Quality RN be given access to incident reporting electronic system in an effort to efficiently track and trend infections/infestations.

**Emergency Response:**
- No oxygen tank available on cart because holder is broken.

EXHIBIT 4

61

- Oxygen is currently kept locked in Biohazard room and is not easily accessible in case of an emergency.
- No employees report a mock code ever being done nor could documentation be found.

**HIPAA:**
- Clip board with participant DNR status is kept on top of cart; consequently, unsecure PHI.

**Clinic Exam Rooms:**
- Wound care supply cabinet unlocked and unattended.
- Algicell expired 7/16
- SaniCloth with bleach expired 7/16.
- Spill cleanup kits expired 8/16.
- Recommendation:
  - Write expiration dates on boxes and containers as appropriate.

**Lab:**
- Fridge temperature checks missing for the month of September up to the 21st. Also, missing several other various times. Prior months logs appear completed.
- Freezer temperature log needs parameters included on form.
- Expired supplies:
  - Solution A yellow top tubes all expired 8/2016.
  - Blue trace element tubes expired 12/15.
  - 2 drug testing kits expired 11/2015.

EXHIBIT 4

62

# EXHIBIT 5

EXHIBIT 5

63



From: KLapcewich@myinnovage.org
To: lapcewich@aol.com
Sent: 9/29/2017 9:27:35 AM Pacific Standard Time
Subject: Fwd: Orders Tracking


Sent from my iPhone

Begin forwarded message:
  **From:** "Dahl, Paula" <PDahl@myinnovage.org>
  **Date:** September 29, 2017 at 9:14:38 AM PDT
  **To:** "Lapcewich, Karen" <KLapcewich@myinnovage.org>
  **Subject: Fwd: Orders Tracking**
  From the Schedulers


  Begin forwarded message:
    **From:** "Garcia, Tara" <TGarcia@myinnovage.org>
    **Date:** September 29, 2017 at 10:01:55 AM MDT
    **To:** "Dahl, Paula" <PDahl@myinnovage.org>
    **Subject: Fwd: Orders Tracking**

EXHIBIT 5

64

Sent from my iPhone

Begin forwarded message:
>**From:** "Castillo, Alma D." <ACastillo@myinnovage.org>
>**Date:** September 29, 2017 at 8:34:13 AM PDT
>**To:** "Garcia, Tara" <TGarcia@myinnovage.org>
>**Subject: Orders Tracking**

Hi Tara,

Here is what I found,

Total Outside Consults 867

2015 1 order

2016 93 orders

2017 760 orders

2018 12 orders

2019 1 order

Total Consults Imaging 108

2016 4 orders

2017 101 orders

2018 3 orders

Total Days 30 and over 852

There are 15 orders that are in the plus

Keep in mind that I do not think I have all the access to orders tracking like Kalondrea did.

She was able to see all outstanding orders. Clinic, Labs, dentist, OT, OP, etc…

Hope this helps ☺

EXHIBIT 5

**Alma Castillo**

**Authoriztion Rep / Outside Scheduler**

**InnovAge Greater California PACE – Inland Empire**

410 E Parkcenter Circle North

San Bernardino, CA 92408

Office: (909) 890-2837

Email: acastillo@myinnovage.org

Website: www.MyInnovage.org

**NOTICE TO RECIPIENT:** This electronic mail may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). If you are not the intended recipient of this email, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this message in error, please notify the sender immediately by reply email. Please then delete the original message and attachments without reading, forwarding or saving them.
Thank you.

From: KLapcewich@myinnovage.org
To: lapcewich@aol.com
Sent: 9/29/2017 4:24:08 PM Pacific Standard Time
Subject: Fwd: PAC 9.26.17


Sent from my iPhone

Begin forwarded message:
    **From:** "Haywood, Jaynell" <JHaywood@myinnovage.org>

EXHIBIT 5

66

**Date:** September 29, 2017 at 4:21:53 PM PDT
**To:** "Lapcewich, Karen" <KLapcewich@myinnovage.org>
**Subject: PAC 9.26.17**

Here you go, have a great week-end!

**NOTICE TO RECIPIENT**: This electronic mail may contain information that is
privileged, confidential, and/or otherwise protected from disclosure to anyone other than
its intended recipient(s). If you are not the intended recipient of this email, you are
prohibited from sharing, copying, or otherwise using or disclosing its contents. If you
have received this message in error, please notify the sender immediately by reply email.
Please then delete the original message and attachments without reading, forwarding or
saving them.
Thank you.

PAC 9.26.17.docx        ATT00001.htm

EXHIBIT 5

67

# EXHIBIT 6

EXHIBIT 6

68

**Considerations for Improving the Provider Network
for InnovAge-PACE of Greater San Bernardino**

**Submitted by Frank Randolph, MD, Owner, Director, Integrated LTC Medical Group
July 19, 2017**

**Integrated Long Term Care Medical Group**
The Group provides professional medical services to participants of InnovAge-PACE of Greater San
Bernardino.  It is a physician-owned medical group employing California-licensed physicians and nurse
practitioners with training and experience in the care of older adults with a variety of acute and chronic
illnesses. Physicians are board certified in either internal medicine or family medicine.  Nurse
practitioners have attained a master's degree in nursing. Within the Group are three physicians with
board certification in Geriatric Medicine. Group Practice objectives include the promotion of best
practices for chronic conditions such as dementia, delirium, polypharmacy, chronic pain, osteoarthritis,
osteoporosis, falling, frailty, depression, heart failure, cancer, infections, anemia, incontinence, cardiac
arrthymias, COPD, coronary artery disease, peripheral vascular disease, stroke, vision and hearing loss,
diabetes, and hypertension. Group members join other PACE Center professionals in regular
interdisciplinary care planning conferences. They collaborate with community professionals (home
care, hospice, medical and surgical specialists, mental health professionals, and others) in the day-to-
day delivery of health care for PACE members. Group professionals must maintain a practical, regular
collaboration with local medical specialists, surgical specialists, radiologists, hospitalists, post-acute
care specialists, psychiatrists, psychologists, pain management experts, and many other professionals
serving elders.

**Provider Network Requirements**

**CMS Requirements  § 460.70 Contracted services.**  Contractor must be accessible to participants,
located either within or near the PACE organization's service area. PACE must designate an official
liaison to coordinate activities between contractors and the organization. A current list of contractors
must be on file at the PACE center and a copy must be provided to anyone upon request. Each contract
must be in writing and include the following information: Name of contractor, Services furnished
(including work schedule if appropriate), payment rate and method, Terms of the contract, including
beginning and ending dates, methods of extension, renegotiation, and termination. Contractor
agreement to do the following: (i) Furnish only those services authorized by the PACE interdisciplinary
team, Accept payment from PACE and not bill participants, CMS, the State administering agency, or
private insurers, (iii) Hold harmless CMS, the State, and PACE participants if the PACE organization
does not pay for services performed by the contractor in accordance with the contract, (iv) Not assign
the contract or delegate duties under the contract unless it obtains prior written approval from the
PACE organization. (v) Submit reports required by the PACE organization, (vi) Agree to perform all
the duties related to its position as specified in this part, (vii) Participate in interdisciplinary team

EXHIBIT 6

69

meeting as required, (viii) Agree to be accountable to the PACE organization, (ix) Cooperate with the competency evaluation program and direct participant care requirements specified in §460.71.

**Medical Group Role Credentialing**: The San Bernardino Credentialing Review Committee has been delegated the authority for credentialing of all providers, and to act as a professional/peer review body. The Committee establishes minimum requirements of providers of services for the Program of All-Inclusive Care for the Elderly (PACE) for participation status in IGCAP's provider network. Integrated LTC Medical Group is represented on this Committee.

**Recommendations:** Since the PACE start-up in 2014, development of a successful Provider Network has been challenging. The search for consultants did not afford a range of choices among the different types of consultants from each specialty area, nor did it consider geographic considerations (proximity of consultant to InnovAge Center in San Bernardino). Key services were developed Riverside County but the majority of participants are from San Bernardino County. Participants living in San Bernardino were often place in facilities in Riverside County because there were more contracted Riverside County facilities. Many consultants, physicians, hospitals, SNFs, were unfamiliar with the PACE model. Consultant networks such as IPAs were not interested in serving patients population outside of theier network. Contracted hospitals and nursing homes provided contracts for their services with no link whatsoever to the physician consultant groups serving them. Many consultants wanted Medicare rates of 125% or greater. Some consultants failed to provide timely or meaningful consultation, or to be accessible by phone call. Participants expressed frustration both informally and formally (grievance, disenrollment) with consultant delays, inadequate care, or problems with f/u, or timely acquisition of prescription medications ordered by consultants. Consultants (office-based, hospital and nursing home-based) rarely returned phone calls to PACE staff or physicians. PACE schedulers frequently have difficulty making appointments with contracted providers. As the geographic distribution of PACE participants expands to the geographic limits of both San Bernardino and Riverside Counties, the unique problem faced by health care organizations in these Counties will become a problem for InnovAge. This problem stems from the fact that these are the two largest land masses in the United States, and finding consultants in the periphery will be difficult. I have reviewed the current list of consultants, and assessed the quality of consultants to date through dialog with current medical providers and through medical record review. In the following pages are suggestions for consultant selection in the near future. As our program grows in size we will need to collaborate with larger physician networks and the two medical societies, and identify PACE-friendly telemedicine consultants. In addition, we should collaborate with other California PACE programs to identify California-specific strategies. We need to create a Provider Network Task Force to perform a SWAT analysis on the current network, assess past grievance and disenrollment, dialog with providers and schedulers, assess existing contract wording, and to develop a strategy which must include, at a minimum, the development of an ongoing liaison with local consultants and health care entities (hospitals, SNFs, assisted living facilities) to provide education regarding the program and its objectives, and to target the types of consultants and ancillary services felt to be necessary by the current California PACE professional team.

EXHIBIT 6

I.   **Key Medical Specialty Consultants-**Cardiology, Neurology, Pulmonary/Sleep Medicine, Nephrology, Endocrine, Pain Management, Oncologist
**Suggested Groups or Individual Consultants**
**Cardiology:**   Loma Linda Cardiology
**Hem/Onc**       Inland Hematology Medical Group (already contracted) Dennis Hilliard
**Sleep Disorders**     Imran Sharief  (already contracted)
**Endocrine**          Lamont Murdock (LLU and ARMC)
                       Suvesh Chandiok (ARMC)
                       Kevin Codorniz (LLU)
**Hepatology**         LLU-Volk
**Nephrology**         Allan Kavalich (already contracted)
**GI**                 Bob Evans
                       Huang-mixed reviews (well regarded by Chinese patients)
**Rheumatology**       Dr. Krick-ARMC

II.  **Key Surgical Specialty Consultants** (General Surgery/Breast, Vascular, Orthopedics, Urology, ENT, Gynecology, Pain Management, Surgical Oncology, Podiatry)
**Suggested Groups or Individual Consultants:**

**Urology**
1) Loma Linda University Urology Favorites  Ruckle, Lui, Staack (Female)
2) Dan Lama, MD San Bernardino 489 E 21st St 92404 (909) 882-2973

**Not recommended    Thaker**

**ENT**
Sharen Jeffries; ENT, Redlands

**General Surgery**
Cal Med Physician and Surgeons Inc.  (Already Contracted)
Favorites      General: John Culhane/Joe Davis
Surg Onc-Farabi Hussain

Reuben Osorio (already contracted)

**Vascular Surgery:** Cal Med Physician and Surgeons Inc. (Contracted)
Dev Gnanadev/Milton Retamozo

**Neurosurgery:**
Dan Miulli, Javed Siddiqui (Cal-Med contract inadequate; additional contract required (info sent to Tara Garcia)

EXHIBIT 6

**Ortho**
Arrowhead Ortho (Contracted): Favorites: Hopkins, Merkel, Frykman, Doty
Jim Matiko (Hand/shoulder), John Steinman (Back surgery)

**Podiatry**
**Loma Linda Foot and Ankle-strongly recommended by staff**
Not recommended- O'Reilly

**Gynecology**   Karen Gaio-Hansberger-Redlands


III     **Pain Management**

LLU: Justin Hata/Anne Cipta
Arrowhead Ortho (already contracted)---Michael O'Shea (Pain Management)

IV     **Mental Health** (pending contract for Telemedicine we'll need local consultants)
Identify 2-3 Psychiatrists (Preferably Gero-Psychiatrists)
Identify 1-2 psychologists (and possibly one neuro-psychologist)

**Suggested Groups or Individual Consultants**
Dogon Behavioral Medical Group-Samuel Dey-Riverside (Geropsychiatry)
4960 Arlington, Suite B, Riverside 951-341-8930
Marissa Mejia, MD (Geropsychiatry) 850 East Foothill Blvd,
Rialto  Mesa Counseling Center 909-421-9200
Stacy Wood, PhD, Neuropsychologist, Claremont, 909-607-9505 (currently doing elder
abuse-self neglect assessment for APS/Public Guardian)

V.     **Ophthalmology /Optometry**

**Ophthalmology**
**Cal Med (already contracted)**
**Favorites**     Kris Storkersen, Keith Tokuhara
**Existing**      Macias-mixed reviews

**Optometry**
Arthur Friedman, O.D.  (excellent) (Already contracted)

EXHIBIT 6

72

**VI.   Radiology/Imaging**

**Riverside County**
Beverly Radiology Med Group-no real experience with them but we have contract
**San Bernardino Country**
PMDTC, LLC dba Town and Country Diagnostics Mobile)-unclear experience
Palm Imaging-recommend-good radiologists/two locations near us, San Bdno, Rialto
ARMC-recommend for complex stuff; great radiologists, high quality techs, close.
**Valley Radiotherapy**
**Favorite**      Leslie Yonemoto

**VII.   Hospitalists**
**Identify hospitalist groups at the 2-3 closest hospitals in each County**
**San Bernardino County:**
**Arrowhead Regional Medical Center**
**Suggested Groups or Individual Consultants**
Bruce Gipe, MD-Int Med
David Lanum-Fam Med

**2) Loma Linda University Medical Center**
**Suggested Groups or Individual Consultants**
Contact Rhodes Rigsby or Ray Wong

**Riverside County**
**1) Riverside County Regional Medical Center (Moreno Valley)**
**Suggested Groups or Individual Consultants**
Wael Hamade MD

**2) Riverside Community Hospital (Riverside)**
**Suggested Groups or Individual Consultants**
Ramses Pai, MD/Matt Butteri, MD (UCR Int Med/Geriatrics)

**IX   Post Acute Care/Skilled Nursing Facilities**

**Heritage Gardens Heath Care Center-Loma Linda**
**Rialto Post-Acute-Rialto**

**SNF Physicians**
**Suggested Groups or Individual Consultants**
Mihir Sanghvi, MD (already contracted)

EXHIBIT 6

73

# EXHIBIT 7

EXHIBIT 7

74

## Participant Advisory Committee Minutes

| Meeting topic | Emergency Participant Advisory Committee | Date | September 26, 2017 |
|---|---|---|---|
| Host | Jaynell Haywood, Maribel Echeverria | Time | 10:17am- 11:27 |
| Location | ADHC 4 | Scribe | Jaynell |
| Core Group | In Attendance: Mr. Fuentes, Ms. Bracamonte, Ms. Hicks, Mr. Zammarripa, Mr. Tunis, Ms. Morgan, Ms. Feltins Jaynell Haywood-ADHC Manager, Maribel Echeverria-Activities Coordinator Phone Attendance: Mr. Montgomery | | |
| Department Reviews From: | Guests: Zaren Lapcewich- COO, Healevy Godison- Quality, Marc Cameron- Center Direction | | |

| Agenda Item / Topic | Discussion/Information / Decision | Action / Deadline |
|---|---|---|
| Welcome, Introductions | Karen Lapcewich gave welcome and introductions. | |
| Approval of Minutes and Review of Agenda | Karen– COO called an emergency PAC meeting to discuss changes in staff and changes occurring at InnovAge. Committee meeting; no changes recommendation or concerns were brought up. | |
| Review of PAC Purpose | | |
| InnovAge Leadership Review | PAC members were given the information regarding change of leadership with the Chief Operating Officer and the Executive Director. | Plans to hire a new Executive Director with lots of PACE experience. InnovAge team is working together to prevent bumps. Interviewing for Executive Director. |

EXHIBIT 7

75

| Agenda Item / Topic | Discussion/Information / Decision | Action / Deadline |
|---|---|---|
| Compliments and Concerns | **Concern 1:** PAC members are concerned with the constant change in upper management. Several members feel like the change in upper management is not addressing the issues that occur in the multiple disciplines.<br><br>**Solution 1:** Upper management should walk around the center to monitor the staff's work.<br><br>**Concern 2:** PAC member expressed concerns about medication delivery. will InnovAge continue to work with PharmAmerica? InnovAge is not the only ones responsible for the medication issues. PharmAmerica needs an improvement. Will InnovAge speak with PharmAmerica in improving their medication process? Ppt. will follow medication protocol but there are still timely issues in med delivery. Ppts are running out of medication due to not receiving medication in a timely manner. Changes in staff completing the medication sorting and delivery are not being communicated properly. Medication ordering system is not functioning well. These issues are continuous since day one. Ppts are not receiving their medications regularly. The medication issues have been persistent since the start of the company. Medications are not delivered in a timely manner. Medications need to be 100% accurate, InnovAge needs to make the right changes for the safety of the ppt.<br><br>*Solution 1:* InnovAge to conduct a meeting with PharmAmerica regarding the medication issues<br><br>**Concern 3:** PAC members expressed some concerns regarding the continuous change in upper management? InnovAge constantly lets go of upper management. There are too many changes to the upper management and not to the lower level staffing, The changes are not addressing the issues. PAC members are having a hard time readjusting to the many changes in staffing. | 1: COO- PAC is encouraged to communicate with the COO. COO validating PACs concerns and validating that there are concerns that need to be addressed and InnovAge is actively working on it. Pac encouraged to communicate concerns and successes with InnovAge.<br><br>1: PAC suggest management be vigilant in ensuring staff are doing their job<br><br>2: COO, CD, TR are actively working to correct the medication problem.<br><br>2: CD and COO to speak with pharmacy representative<br><br>2: PAC members asked InnovAge to work with PharmAmerica to eliminate medication errors.<br><br>2: PAC suggest InnovAge get a new pharmacy<br>COO- PharmAmerica will continue with InnovAge. A courier(Drivers) will be hired for InnovAge to efficiently transport and deliver medications to ppt. InnovAge is working to improve the medication process. The medical director and the |

EXHIBIT 7

| Agenda Item / Topic | Discussion/Information / Decision | Action / Deadline |
|---|---|---|
| | *Solution 1:* Improve communication regarding all staff changes | clinical director will assist in improving the medication process. Not promising to turn around Pharmamerica, but there will be improvement in InnovAge's medication delivery. |
| | **Concern 4:** PAC expressed concerns regarding the bad customer service exhibited by clinic staff. Clinic staff conversing with ppt. in clinic lobby area regarding their medical needs and ppts are shoved from location to location. LVN should not be conversing private information with ppt. in a public area. Clinic staff need communication and customer service improvement. Ppts. are not being seen before they leave the center. The clinical staff are being bombarded with negativity. Current clinical receptionist is not equipped to be in that role. No one is following-up with the ppt. Ppts are tired of the change in doctors. | 3: Communication will improve with the hiring of more staff in their appropriate positions

4: COO- New clinical director. Clinic is going to advance with the help of a new leader. Validates the communication issues between the transportation department and the clinic. Transportaion Manager will be assisting with these changes. |
| | **Solution 1:** Hire the appropriate staff for the position. | Organization needs to be implemented and communication needs |
| | **Solution 2:** The Clinical Director located outside of the clinic | improvement. New Medical Director will help organize the clinic. Clinic needed a dedicated medical director in order to build a strong clinic in the center. Hiring permanent doctors for the clinic. |
| | **Concern 5:** PAC members stated that some participants are not satisfied with the menu options. | |
| | **Solution 1:** Better communicate the menu options to the ppts. | 4: COO will address the issues with the new Clinic director and the medical director. |
| | **Compliment:** PAC members report that the new implemented communication system (MARC- walkie talkie system) is working perfectly! Has really improved the way ppts are escorted to the clinic. Jaynell, Maribel, and drivers are excellent-ppt. looks forward to working with this staff. Everyone is calm and enjoying the activities. PAC feels comfortable communicating with Jaynell about their concerns. They feel she is helpful when they have medication issues. | 5: ADHC Manager: in the process of |

EXHIBIT 7

| Agenda Item / Topic | Discussion/Information / Decision | Action / Deadline |
|---|---|---|
| | | implementing the new dietary program. Menu has changed and menu items are chosen according to the majority. Alternative options are offered daily. Dietary works to accommodate as best they can to the needs of the ppts.

*Other: PAC has agreed to invite the COO back to the PAC meetings on a regular basis. |
| Other | | |
| Heath Care | | Ongoing |

78

EXHIBIT 7

| Agenda Item / Topic | Discussion/Information / Decision | Action / Deadline |
|---|---|---|
| Update | | |
| Center Updates | Center Director- Marc Cameron<br>Transportation Manager- Brian Wilson<br>Hired 2 dieticians<br>Hiring Occupational Therapist<br>Hiring another MD<br>Hiring more nurses<br>Hiring more drivers<br>Hiring 2 more CNAs<br>Hiring Clinic Reception | None |
| Other Updates | Provide something that designates Ppt is part of a PAC<br>PAC proposes a change in meeting time so other PAC members can participate in the meetings | ADHC- will order the badges, change meeting time |
| QAPI Report | None | On-going |
| Next Meeting Discussion | | |

EXHIBIT 7

| Agenda Item / Topic | Discussion/Information / Decision | Action / Deadline |
|---|---|---|
| | | |
| Next Meeting | Next PAC Meeting will be held on November 14, 2017 10:30 am | |

EXHIBIT 7

80

# EXHIBIT 8

EXHIBIT 8



From: KLapcewich@myinnovage.org
To: lapcewich@aol.com
Sent: 9/28/2017 9:20:00 PM Pacific Standard Time
Subject: Fwd: Med Processes


Sent from my iPhone

EXHIBIT 8

Begin forwarded message:

> **From:** "Lapcewich, Karen" <KLapcewich@myinnovage.org>
> **Date:** September 28, 2017 at 8:58:53 PM PDT
> **To:** "Hewitt, Maureen" <MHewitt@myinnovage.org>
> **Subject: Fwd: Med Processes**
> Maureen,
> I would like to schedule a call with you, Vanessa and Denise. These findings are extremely concerning as other operational matters that I would like to discuss. To include:
> Care plans
> ID team functionality
> Orders tracking
> Pharmacy medications
> Clinic operations and outcomes.
> Public guardian concerns
>
>
> I am gathering information in the morning so to best understand the scope and severity of these matters.
>
> Many thanks
> Karen
>
>
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** "Price, Lisa" <LPrice@myinnovage.org>
> > **Date:** September 28, 2017 at 3:02:37 PM PDT
> > **To:** "Chase, Darla" <DChase@myinnovage.org>, "Cameron, Marc" < MCameron@myinnovage.org>, "Lapcewich, Karen" < KLapcewich@myinnovage.org>
> > **Cc:** "Dillman, Kimberly" <KDillman@myinnovage.org>
> > **Subject: RE: Med Processes**
> > Thank you Darla.
> >
> > There is a lot to take in and improve here.
> >
> > 1. Transportation
> >
> > 2. Med room
> >
> > 3. Primary care/pharmacy communication

EXHIBIT 8

83

4.   Participant communication

I think we need to break this down into who is going to assure follow through on each process.

Kim, can you please work with Dr Siraj on educating the primary care providers on the faxing to the pharmacy and controlled substances?  I would like to understand barriers and also if we need to consider eprescribing.

I will defer to Karen and Marc on the transportation, med room and participant communication – but happy to assist if that would be helpful.  I do think the idea of leaving a note on the door is a great idea and something that would be worth thinking about for the whole organization.

**From:** Chase, Darla
**Sent:** Thursday, September 28, 2017 2:40 PM
**To:** Price, Lisa <LPrice@myinnovage.org>; Cameron, Marc <MCameron@myinnovage.org>; Lapcewich, Karen <KLapcewich@myinnovage.org>
**Cc:** Dillman, Kimberly <KDillman@myinnovage.org>
**Subject:** FW: Med Processes

Kimberly was asked to see how the processes are going. Here is the scenario from this morning.

**Darla Chase, RPh, BPharm**
Phone: 720-974-6785
Cell: 720-688-3470
Fax: 303-996-1614

**From:** Dillman, Kimberly
**Sent:** Thursday, September 28, 2017 2:20 PM
**To:** Chase, Darla <DChase@myinnovage.org>
**Subject:** Med Processes

Hi,

So here's wha t I found out this morning . . .

1.   There still is no transportation courier for deliveries of meds.  33 bags of meds were waiting to be delivered in the clinic this morning.  15 additional bags were received from the pharmacy last night and were waiting to be processed by Fabbie this morning.  As per the previous email re: █████, transportation is not consistently taking meds out.  Additionally, there is a med which was delivered

EXHIBIT 8

84

to the clinic last night for a ppt that transportation said will not be able to be delivered until next Tuesday.

2.   Fabbie has not been receiving the refill report daily.  She says that she was originally receiving it daily but does not remember when that stopped.  She printed out today's list but could not locate the last Refill Reminder that she received in her emails.  I have set her up to receive daily again and have asked her to notify me immediately if she does not receive them daily.

3.   The Refill Reminder gives 5 days worth of data – Anything available for refill today and the 4 previous days.  So, meds are due to run out either tomorrow (meds dispensed on 8/29) or the next few days.

4.   We are not receiving end of day med delivery info consistently re: meds still in the clinic which have not been delivered nor info from transportation re: missed deliveries.  Per Fabbie, the pharmacy is sending notification of missed delivery attempts in the AM.  However, it appears that this did not occur with that STAT delivery for ███████████ (see email)  **I have asked Fabbie to follow up with the workflow and put out a list daily.  However, with 48 bags of meds in the clinic as of last night, this seems like an excessive amount of work for her.  If we can get the transportation delivery process working and the missed med delivery notifications working, I think that would be the best solution instead of putting the extra burden on Fab bie.

5.   When meds are not delivered, the workflow is not being followed and the ppts are not being contacted to notify them of the missed delivery/follow delivery date/time.  There was talk about placing a notification card on the ppt's door when delivery was missed – who is supposed to order these?  They are not being utilized at this time.  I've asked Fabbie to follow up with the ppts on these missed deliveries but again, if transporation is not going to deliver the meds until several days later this seems to be a problem.

6.   Fabbie spent most of the morning tracking down reports of meds not received.   She had 49 voicemails waiting for her when she arrived for work this morning.  As of 11am, she had been able to listen to only very few of them and had not had any opportunity to make follow up calls if ppts are only requesting a few meds on their lists.

7.   When meds are delivered, the pharmacy is sending a notice whenever a partial supply is fill and is now also sending a notice when not all meds which were ordered are filled (e.g., previous email re: ██████████ – med required special ordering)

8.   Some ppts are calling the pharmacy directly and have been told by InnovAge providers to do this.  This is a problem and is not following the InnovAge procedures.  Not sure how to get this to stop when a precedent has already been

EXHIBIT 8

85

set by some providers.

9.   Still having issues with Narc scripts not being sent when meds are ordered in the EMR or in some cases (as we found today w/ ██████ – hard script was written but med was not ordered in the EMR).  Still having problems with incomplete hard scripts – improvement noted though.  I'll review again today with the providers.

10. Still  having problems with providers not efaxing the orders to the pharmacy – will review again today with the providers.

11. Voicemail line for med refills – I haven't had a chance to double check if this is working yet.  However, it is my understanding that if two ppts call at the same time, it won't answer.  Not sure if this is true or not but someone should check this out or come up with an alternative solution if it's true.

12. There needs to be a specific (in writing) time frame for delivery of meds for the pharmacy.  Ppts have complained of late deliveries.  I'm not sure how to track this down without specifics.  If the meds are ordered late by the providers, there is not much the pharmacy can do.   Can we get a cut off time for ordering of meds?  Delivery only between 4-8pm unless otherwise specified (in writing)?

13. OTCs are not consistently being given to the ppts when ordered.  Providers are not consistently notifying the RNs to pull these meds when they initially order or reorder (during a PA).  I'll review again with them today.

Take care,
Kimberly

NOTICE TO RECIPIENT: This electronic mail may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). If you are not the intended recipient of this email, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this message in error, please notify the sender immediately by reply email. Please then delete the original message and attachments without reading, forwarding or saving them.
Thank you.You will see orders tracking throughout the documentation

EXHIBIT 8

86

# EXHIBIT 9

EXHIBIT 9

87



From: KLapcewich@myinnovage.org
To: DTriba@myinnovage.org
Cc: MHewitt@myinnovage.org
Sent: 10/9/2017 5:34:38 PM Pacific Standard Time
Subject: Fwd: Concerns

Denise , as you know last week I asked for help in the clinic  and I was told there wouldn't be
any. Michele said that she would have weekly calls and Tracey could pick up from other nurses
in how to run the clinic. Gina stated that she didn't have" any nurses hanging around for us to
use" As you're also aware , I've asked someone to stay behind because the clinic is
fundamentally failing and I was told there would be no resources provided.

Please read Tracey's email,  it speaks for itself .I am not a clinician and this is beyond my scope.

EXHIBIT 9

88

Having Tracey and others in the clinic flail like this is unacceptable.

Forgive me if this sounds pointed or overreactive.

I won't be able to do too much more communication because of the fire but we will talk tomorrow.

Karen

Sent from my iPhone

Begin forwarded message:

**From:** "Miller, Tracy" <TrMiller@myinnovage.org>
**Date:** October 9, 2017 at 2:22:47 PM PDT
**To:** "Lapcewich, Karen" <KLapcewich@myinnovage.org>
**Cc:** "Blanton, Michelle" <MBlanton@myinnovage.org>
**Subject: Concerns**
Dear Karen,

As a new week starts here at Innovage, I wanted to reach out to you regarding some concerns and requests. There are some big issues in the clinic, as you are aware, and I cannot be effective in guiding staff or problem solving when I have not completed my own orientation. There seems to be a lack of organization, resources, and time to achieve appropriate staff training. This is not only a problem for myself but also a problem that has been persisting throughout the facility. What I would like to accomplish is to learn my role, as well as, how the facility/clinic operates so that I can be an effective resource. With that said, I have come to learn that Michelle will be here next week to orient with me and for that I am much appreciative. In the meantime, I need time to orient with other disciplines. I also need to follow the clinic staff, and triage nurse to understand the process and flow.

This morning I was able to meet with Marc and Chanel to go over some issues with a grievance from one of the RNs. We also discussed our staffing needs. I think we have a good idea as to what positions need to be filled and have started interviewing to fill those positions. My concern in gaining new hires is that they too will not get the proper training they need. Who is responsible for training new nurses here? Also, how can we get training for the existing nurses who did not have proper training when they were hired? I am getting reports from the current staff that they feel fearful for their license, fearful for patient care, and unsupported. How can that be addressed? Additionally, there are pharmacy concerns and I have not been oriented in that department yet. Is that another area that Michelle does the training on or do I need to connect with someone else? For the staff who are lacking the training for certain medications, I have reached out to Kim (pharmacist) to have some inservices done on Thursdays when she is here. I have also determined Thursday afternoons at 3:30 to have staff meetings. I have asked that Chanel attend those so that staff can voice any concerns to her. If you have any other suggestions for me please let me know.

EXHIBIT 9

89

I am not sure what else at this time to ask for so I will end here. Thank you for listening to my concerns and providing me support.

Tracy

**NOTICE TO RECIPIENT**: This electronic mail may contain information that is privileged, confidential, and/or otherwise protected from disclosure to anyone other than its intended recipient(s). If you are not the intended recipient of this email, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this message in error, please notify the sender immediately by reply email. Please then delete the original message and attachments without reading, forwarding or saving them.
Thank you.

EXHIBIT 9

90